848 F.2d 256
 270 U.S.App.D.C. 199, 18 Envtl. L. Rep. 21,145
 PUBLIC CITIZEN, et al., Petitioners,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, et al., Respondents,
Ford Motor Company, Automobile Importers of America, Inc.,
General Motors Corporation, State of New York,
Intervenors.
PEOPLE of the State of California, et al., Petitioners,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, et al., Respondents,
Ford Motor Company, Automobile Importers of America, Inc.,
General Motors Corporation, State of New York,
Intervenors.
CITY OF NEW YORK, et al., Petitioners,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, et al., Respondents,
Ford Motor Company, Automobile Importers of America, Inc.,
General Motors Corporation, State of New York,
Intervenors.
CITY OF LOS ANGELES, a California Municipal Corporation, Petitioner,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, et al., Respondents,
Automobile Importers of America, Inc., General Motors
Corporation, Ford Motor Company, Intervenors.
 Nos. 85-1745 to 85-1748.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 25, 1986.
Decided June 7, 1988.
 
 Cornish F. Hitchcock, Washington, D.C., and Susan L. Durbin, Deputy Atty. Gen., State of Cal., Los Angeles, Cal., with whom Alan B. Morrison, Clarence M. Ditlow, III, Washington, D.C., for Public Citizen, et al., John K. Van de Kamp, Atty. Gen., State of Cal., San Francisco, Cal., Theodora Berger, Asst. Atty. Gen., Los Angeles, Cal., Craig C. Thompson, Deputy Atty. Gen., State of Cal., Sacramento, Cal., James D. Montgomery, Corp. Counsel, and Amy L. Beckett, Asst. Corp. Counsel, Chicago, Ill., Gary R. Netzer and Roger J. Holt, Los Angeles, Cal., Robert Abrams, Atty. Gen., State of N.Y., Peter Bienstock and Samuel A. Cherniak, Asst. Attys. Gen., State of N.Y., New York City, were on the joint brief for petitioners and intervenors in Nos. 85-1745 et al. Walter A. Kretz, Jr., New York City, entered an appearance for petitioners, City of New York, et al. in No. 85-1747. Nancy Minor, Asst. Corp. Counsel, Boston, Mass., entered an appearance for petitioner, City of Boston in No. 85-1747.
 Ezra I. Bailik entered an appearance for intervenor, State of N.Y. in Nos. 85-1745 et al.
 Mark B. Stern, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., John F. Cordes, Atty., Dept. of Justice, Stephen P. Wood and David W. Allen, Asst. Chief Counsels, Enid Rubenstein, Eileen T. Leahy and J. Edward Clancy, Attys., Nat. Highway Traffic Safety Admin., Washington, D.C., were on the brief for respondents in Nos. 85-1745 et al.
 Edward W. Warren, with whom David G. Norrell, Washington, D.C., Williams L. Weber, Jr., and Thomas L. Arnett, Detroit, Mich., were on the brief for intervenor, General Motors Corp. in Nos. 85-1745 et al. Arthur F. Sampson, III, Washington, D.C., also entered an appearance for intervenor, General Motors Corp.
 Paula Winkler-Doman and James A. Brown, Dearborn, Mich., were on the brief for intervenor, Ford Motor Co. in Nos. 85-1745 et al.
 Milton D. Andrews, Lance E. Tunick, Barry S. Neuman, Washington, D.C., and Charles H. Lockwood, III, Arlington, Va., were on the brief for intervenor, Auto. Importers of America, Inc. in Nos. 85-1745 et al.
 Curtis F. Thompson, Asst. Atty. Gen., State of Mo., Jefferson City, Mo., was on the brief for amici curiae, State of Mo. and State of Okl., urging affirmance of the orders on review.
 Joseph A. Califano, Jr. and Gerald M. Rosberg, Washington, D.C., were on the brief for amicus curiae, Chrysler Corp., urging remand.
 Before MIKVA, RUTH BADER GINSBURG and SILBERMAN, Circuit judges.
 Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.
 Dissenting opinion filed by Circuit Judge SILBERMAN.
 RUTH BADER GINSBURG, Circuit Judge:
 
 
 1
 Petitioners challenge a final rule issued by the National Highway Transportation Safety Administration (NHTSA) pursuant to the Energy Policy and Conservation Act of 1975 (EPCA);[1] the rule, released September 30, 1985, set the mandatory Corporate Average Fuel Economy (CAFE) standard for 1986 model year passenger automobiles at 26.0 miles per gallon (mpg).[2] EPCA specifies a higher 27.5 (mpg) 1986 CAFE standard,[3] with the proviso that this standard may be amended by rule and set at the "maximum feasible average fuel economy level,"[4] determined by reference to criteria listed in the statute.[5]
 
 
 2
 Petitioners, four non-profit consumer and environmental organizations, four municipalities, and the State of California, assert that NHTSA's decision to "roll back" the CAFE standard specified by statute is arbitrary and capricious, and contrary to EPCA. The agency's determination that the higher standard was not "economically practicable," petitioners maintain, improperly elevated consideration of market forces and consumer demand, and impermissibly subordinated the statute's "technology-forcing" design. Furthermore, petitioners say that in setting the 26.0 mpg standard, NHTSA ignored the "need of the Nation to conserve energy."[6] Finally, petitioners attack NHTSA's decision not to undertake and issue a complete Environmental Impact Statement (EIS); that decision, petitioners contend, disregards the agency's charge under the National Environmental Policy Act (NEPA).[7]
 
 
 3
 NHTSA initially challenges the petitioners' standing to assert any claims under EPCA or NEPA; on the merits, the agency defends its actions as consistent with all relevant legislative prescriptions. We held this case in abeyance pending the full court's consideration of the standing issue in Center for Auto Safety v. Thomas, --- F.2d 843 (D.C.Cir. 1988) (en banc) (5-4-1 vote) (CAS-II ). In CAS-II, eight members of the ten-member court acknowledged that the panel decision in Center for Auto Safety v. NHTSA, 793 F.2d 1322 (D.C.Cir.1986) (CAS-I ) states the current law of this circuit. In accord with CAS-I, we hold that petitioners (with one exception) have standing under both EPCA and NEPA to challenge NHTSA's action. On the merits, however, we conclude that NHTSA's decision to lower the 1986 CAFE standard "reasonabl[y] accomodat[es] ... conflicting policies that were committed to the agency's care by the statute ...." Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984), (quoting United States v. Shimer, 367 U.S. 374, 382-83, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). We also reject petitioners' challenge to NHTSA's decision not to issue an EIS; under the particular circumstances presented, we do not find that decision so unworthy as to be characterized "arbitrary, capricious, [or] an abuse of discretion."[8] Accordingly, we deny the petitions for review.
 
 I.
 
 4
 The statutory framework for the rulemaking petitioners challenge is described in detail in CAS-I, 793 F.2d at 1324-26; we restate that background summarily here. In EPCA, Congress set the CAFE standard for passenger automobiles for the 1986 model year (and all subsequent years) at 27.5 miles per gallon.[9] The statute authorizes the Secretary of Transportation to amend the CAFE standard, by rule, "to a level which he determines is the maximum feasible average fuel economy level" for a given model year.[10] In making that determination, the Secretary must consider four factors:
 
 
 5
 (1) technological feasibility;
 
 
 6
 (2) economic practicability;
 
 
 7
 (3) the effect of other Federal motor vehicle standards on fuel economy; and
 
 
 8
 (4) the need of the Nation to conserve energy.[11]
 
 
 9
 A manufacturer who fails to meet the applicable CAFE standard is liable for a civil penalty of $5 for each 1/10 mpg by which the manufacturer's fleet average falls below the standard, multiplied by the number of vehicles manufactured.[12]
 
 
 10
 In the rule challenged here, NHTSA[13] determined that "the maximum feasible average fuel economy for MY [model year] 1986 is 26.0 mpg," and accordingly amended the 1986 CAFE standard. The agency emphasized that EPCA "imposed a long-term obligation on manufacturers to achieve a 27.5 mpg fuel economy level, [so that] it would be inappropriate to reduce the [1986 CAFE] standard if a current inability to meet the standard simply resulted from manufacturers previously declining to take appropriate steps to improve their average fuel economy as required by the Act."[14] NHTSA found, however, that General Motors (GM) and Ford, the two largest manufacturers professing an inability to reach the 27.5 mpg level, had "sufficient plans to meet the 27.5 mpg standard, made significant progress toward doing so, and were prevented from fully implementing those plans by unforeseen events."[15] The principal "unforeseen event" NHTSA cited was the rapid decline in gasoline prices during the mid-1980's, attended by a shift in consumer demand away from smaller, more fuel-efficient models. In view of this development, NHTSA set the 1986 standard at 26.0 mpg, the maximum capability of GM and Ford.[16]
 
 
 11
 The agency determined that the higher standard set by the statute would not be "economically practicable" because "any additional efforts by the manufacturers to increase their MY 1986 CAFE would largely be limited to attempts to change product mixes through increased marketing efforts and/or product restrictions ... [which] could result in significant adverse economic impacts and restrict consumer choice to an unreasonable degree."[17] The "possible energy savings associated with maintaining the 27.5 mpg standard," the agency concluded, did not outweigh these negative economic effects; NHTSA regarded the magnitude of possible energy savings as "uncertain" in light of the prospect that restrictions on the availability of larger cars might cause some consumers to retain their older, even less fuel-efficient models.[18]
 
 
 12
 More firmly, NHTSA found the maximum yearly impact of the lower (26.0 mpg) standard on U.S. gasoline consumption to be 210 million gallons, 0.3% of annual U.S. gasoline consumption and 0.09% of annual U.S. petroleum consumption. That savings, NHTSA stated, was not commensurate with "potential sales losses to the industry in the hundreds of thousands, job losses in the tens of thousands, or the unreasonable restriction of consumer choices."[19]
 
 
 13
 NHTSA also determined that the reduction in the CAFE standard for 1986 would not have a "significant impact" on the quality of the human environment within the meaning of NEPA, 42 U.S.C. Sec. 4332(2)(C) (1982).[20] The agency therefore concluded that preparation of a detailed Environmental Impact Statement was unnecessary. NHTSA accordingly converted its preliminary environmental analysis into a final "Environmental Assessment" accompanying its final rule.[21]
 
 II.
 
 14
 We turn first to the standing under EPCA of the organizational petitioners: Public Citizen, Center for Auto Safety, Union of Concerned Scientists, and the Environmental Policy Institute. The same four organizational petitioners were also petitioners in CAS-I. There, we held that the three organizations suing on behalf of their members (Public Citizen, Center for Auto Safety, Union of Concerned Scientists) had standing to challenge a NHTSA rule establishing the fuel economy standard for light trucks. Each of the three organizations, we ruled, had plausibly alleged an actual or threatened injury, fairly traceable to the challenged action, and redressable by judicial action; each, we declared, had satisfied the requirements for standing derived from Article III of the Constitution. CAS-I, 793 F.2d at 1330-35.
 
 
 15
 CAS-I found no impediment to the standing of the three organizations beyond Article III's requirements because "EPCA clearly removes the judicial authority to create prudential barriers by granting review of agency action to those 'who may be adversely affected.' " 793 F.2d at 1337, quoting 15 U.S.C. Sec. 2004(a) (1982). At the same time, we ruled that petitioner Environmental Policy Institute (EPI), which sued on its own behalf, lacked standing; the institutional interests EPI alleged, we held, were insufficient to meet Article III's fundamental injury-in-fact requirement. CAS-I, 793 F.2d at 1328 n. 41.
 
 
 16
 CAS-I involved light trucks, this case involves passenger vehicles, but with respect to the standing of the organizational plaintiffs, the two cases are not rationally distinguishable. We therefore follow CAS-I as the dispositive precedent, see supra 259 and hold that Public Citizen, Center for Auto Safety, and Union of Concerned Scientists, but not EPI, have standing to pursue their ECPA claims in this court.
 
 
 17
 The state and municipal petitioners in this case did not participate in CAS-I, but the court's decision in that case is also dispositive of NHTSA's objections to the standing of California and the cities. The "crux of the standing issue" in CAS-I, was "whether the members of petitioner organizations would have standing to sue in their own right." Id. at 1329-30 (emphasis added).[22] The court found the requisite injury to organization members "who are interested in purchasing the most fuel-efficient vehicles possible: NHTSA's low CAFE standards will diminish the types of fuel-efficient vehicles and options available." Id. at 1332. The named state and municipal petitioners here stand in a position no less viable than the position of the unidentified members of named organizations. The state and cities in question concededly purchase large numbers of passenger vehicles. Their interest as purchasers coincides with that of individual purchasers.[23] If individual purchasers have a stake sufficient to confer standing, so do the state and city petitioners.
 
 
 18
 Respondent maintains that "the question of standing under [EPCA] is ... separate from the issue of standing under [NEPA]."[24] On standing under NEPA, Committee for Auto Responsibility v. Solomon, 603 F.2d 992 (D.C.Cir.1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980), is the current circuit precedent most closely in point. In that case, the Committee for Auto Responsibility (CAR) and the Metropolitan Washington Coalition for Clean Air (MWCCA) challenged the General Service Administration's (GSA) decision to lease federal property for use as a parking facility. CAR and MWCCA charged GSA with failure to comply with substantive prescriptions of the Public Building Amendments of 1972; additionally, CAR and MWCCA asserted that GSA's decision not to issue an EIS in connection with the leasing program disregarded the agency's NEPA obligations.
 
 
 19
 Although we did not sustain standing on the former claim, we held that the organizations could maintain the NEPA claim. We stated in Committee for Auto Responsibility:
 
 
 20
 To possess standing to attack GSA's failure to prepare an EIS, appellants must show that they have been "adversely affected" or "aggrieved" within the meaning of Section 10 of the Administrative Procedure Act (APA) [5 U.S.C. Sec. 702 (1982) ]. That section confers standing only upon those to whom the challenged agency conduct has caused actual injury to an interest within the zone of interests protected by [NEPA]. Section 10 calls additionally upon a party to allege an "injury that fairly can be traced to the challenged action of the defendant, and not injury that results from an independent action of some third party[.]"
 
 
 21
 Id. at 997 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1925-26, 48 L.Ed.2d 450 (1976) (citation omitted)). Endeavoring to apply that test, the court observed that the organizations' members "assertedly [were] affected by noise, air pollution and congestion from vehicles" using the leased space, id. at 998, and those "health and conservational interests ... are clearly within the zone of protection afforded by NEPA." Id. (citations omitted). The injuries alleged by CAR and MWCCA, we further said, were fairly traceable to GSA's failure to prepare an EIS, insofar as the EIS would have "assess[ed] the adverse environmental effects of leasing" and GSA would have had to ensure that the leasing agreement did not "contribute unnecessarily to noise and air pollution in the surrounding area." Id. at 999.
 
 
 22
 Petitioners here assert that NHTSA's decision to lower the 1986 fuel economy standard will occasion various adverse environmental effects, in particular, an increase in automobile emissions; that prospect, petitioners say, did not receive adequate consideration in NHTSA's decisionmaking. NHTSA does not dispute either that petitioners have asserted an injury to interests protected by NEPA, or that the alleged injury is fairly traceable to NHTSA's failure to prepare an EIS; rather, because the 1986 model year has already ended, NHTSA claims that the "environmental effects of the rule will already have occurred and cannot be remedied by the Court." Brief for Respondents at 54.[25]
 
 
 23
 While courts properly resist NEPA-based contests when the environmental effects of the challenged federal action cannot be mitigated,[26] NHTSA's argument omits consideration of a special feature of the statutory scheme here at issue. EPCA's provisions for civil penalties for noncompliance with CAFE standards, see 15 U.S.C. Sec. 2008 (1982), are modified by "carry-back" and "carry-forward" provisions; under these prescriptions, manufacturers can offset penalties stemming from noncompliance in any given model year with credits earned by exceeding the applicable CAFE standards in any three subsequent model years. See id. Sec. 2002(l ). Therefore, even a tardy redetermination of the 1986 CAFE standard, on the basis of a heretofore ignored causal relationship between fuel economy standards, fuel consumption, and environmental effects, could alter the manufacturers' incentives to produce fuel-efficient vehicles in future model years.[27] Cf. CAS-I, 793 F.2d at 1334-35 ("If setting a higher standard cannot result in vehicles with increased fuel efficiency, then the entire regulatory scheme is pointless."); International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 811 (D.C.Cir.1983) (party need not prove that "the requested relief is certain to alleviate their injury" to have standing) (emphasis in original), cert. denied, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). See also Orr v. Orr, 440 U.S. 268, 271-73, 99 S.Ct. 1102, 1107-08, 59 L.Ed.2d 306 (1979) (standing upheld despite prospect that appellant, even if successful in Supreme Court, might fail to achieve the ultimate relief he sought in the litigation).
 
 
 24
 We therefore hold, based on the currently governing circuit precedent set in CAS-I and Committee for Auto Responsibility, that all but one of the petitioners (EPI is the sole exception) have standing to raise the EPCA and NEPA claims asserted in this proceeding, claims to which we now turn.
 
 III.
 
 25
 While petitioners attack NHTSA's decision to reduce the 1986 CAFE standard in virtually every particular, the "principal issue," they contend, is "NHTSA's conclusion that the [27.5 mpg] standard is not 'economically practicable'."[28] NHTSA commenced its analysis by defining an "economically practicable" standard as one "within the financial capability of the industry, but not so stringent as to threaten substantial economic hardship for the industry."[29] The 27.5 mpg standard, NHTSA found, threatened just such "substantial economic hardship"; GM and Ford, who unquestionably account for a "substantial share" of total passenger car sales, could meet that higher standard "only through product restrictions"--i.e., weighting the product mix offered to the public away from larger, less fuel-efficient models--"resulting in significant adverse economic impacts, including sales losses well into the hundreds of thousands, and job losses well into the tens of thousands, and unreasonable restrictions on consumer choice."[30]
 
 
 26
 Lowering the statutory standard whenever the larger manufacturers assert current inability to meet that standard would, without doubt, completely vitiate the statutory scheme; recognizing this, NHTSA stressed its determination that the inability of GM and Ford to meet the higher standard did not result from their "previously declining to take appropriate steps to improve their average fuel economy as required by the Act."[31] On the contrary, the agency concluded that both manufacturers had made "sufficient efforts to improve their fuel economy," efforts which were "overtaken by unforeseen events whose effects could not be overcome by available means within the time available."[32] In particular, commencing in 1983, a substantial and sustained decline in gasoline prices developed, attended by a consumer demand shift to larger and high performance, but less fuel-efficient vehicles. As a consequence of this demand shift, NHTSA observed, production plans made in the early part of the decade, which had been rationally designed to achieve compliance with EPCA's fuel economy target, became inadequate for that purpose.
 
 
 27
 Petitioners contend that NHTSA's "free market approach," which treats consumer demand as an exogenous determinant of feasibility, is "flatly foreclosed" by EPCA.[33] Congress, petitioners maintain, pointed the causal arrow in the opposite direction: "[I]t wanted these [fuel economy] standards to alter manufacturer behavior and to push consumer demand towards more fuel-efficient vehicles."[34] By setting the standard "no higher than market forces dictate," petitioners assert, NHTSA neglected its charge to serve as a brake against the very market forces Congress considered insufficient to achieve EPCA's fuel conservation goals.[35]
 
 
 28
 Petitioners' argument is identical in all material respects to the one we rejected in the context of the light truck fuel economy standard:
 
 
 29
 [W]hile Congress rejected market forces as the sole means of improving energy conservation, that does not mean that consumer demand is irrelevant to the determination of the mandatory standards.... [I]t would clearly be impermissible for NHTSA to rely on consumer demand to such an extent that it ignored the overriding goal of fuel conservation. At the other extreme, a standard with harsh economic consequences for the auto industry also would represent an unreasonable balancing of EPCA's policies.
 
 
 30
 CAS-I, 793 F.2d at 1339-40 (emphasis in original). NHTSA's interpretation of the statutory requirements, and in particular its consideration of the likelihood of economic hardship within its assessment of "economic practicability," must be accorded due weight. Id. at 1338; see also Office of Consumers' Counsel v. FERC, 783 F.2d 206, 218 (D.C.Cir.1986). Based primarily upon analyses supplied by the Departments of Commerce and Energy and the Council of Economic Advisers, NHTSA concluded that the industry-wide economic effects of the higher CAFE standard would be severe.[36] The agency's decision to lower the standard, therefore, is not so devoid of "overall rational support as to warrant the description 'arbitrary or capricious'." Center for Auto Safety v. Peck, 751 F.2d 1336, 1370 (D.C.Cir.1985); see also Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) (agency must offer a "rational connection between the facts found and the choice made").
 
 
 31
 Nor can we agree with petitioners' contention that the agency dishonored its obligation under EPCA to consider adequately "the need of the Nation to conserve energy." NHTSA observed:
 
 
 32
 The agency's [Federal Regulatory Impact Analysis] indicates that the maximum magnitude of any increase in fuel consumption associated with the 26.0 mpg CAFE standard would be 1.54 billion gallons ... over the life of the MY 1986 fleet.... In terms of total U.S. petroleum consumption, it would amount to a maximum yearly increase of 0.09 percent.[37]
 
 
 33
 This increased consumption, while "not ... insignificant," did not, in the agency's view, outweigh the economic hardships associated with the higher standard.[38] Petitioners' claim, we think it fair to state, is not that NHTSA failed completely to consider one of the relevant factors Congress identified; rather, petitioners fault NHTSA for assigning the energy conservation factor too little weight in the agency's overall feasibility calculus.
 
 
 34
 As observed in this court's pathmarking precedent, however, Congress "specifically delegated the process of setting ... fuel economy standards with broad guidelines concerning the factors that the agency must consider." CAS-I, 793 F.2d at 1341 (emphasis in original). Had Congress offered a more precise balancing formula for the agency to apply to the four Sec. 2002(e) factors, see supra 260 we could more confidently discern the agency's compliance with the congressional mandate. In the absence of a sharper congressional delineation, we are unable to conclude that NHTSA's decision did not represent a "reasonable accommodation of conflicting policies that were committed to the agency's care by the statute" or was "not one that Congress would have sanctioned." Chevron, 467 U.S. at 845, 104 S.Ct. at 2783, (quoting United States v. Shimer, 367 U.S. 374, 382-83, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).
 
 IV.
 
 35
 NEPA requires the preparation of a complete EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(2)(c) (1982) (emphasis added). The agency proposing the action has primary responsibility for projecting whether the impact of the proposed action will be "significant" within the meaning of the statute.[39] Sierra Club v. United States Dep't of Transp., 753 F.2d 120, 126 (D.C.Cir.1985); Kleppe v. Sierra Club, 427 U.S. 390, 412-14, 96 S.Ct. 2718, 2731-32, 49 L.Ed.2d 576 (1976). Courts, no less than the agencies themselves, have found it trying to imbue this "vague and amorphous term," Hanly v. Kleindienst, 471 F.2d 823, 831 (2d Cir.1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), with a consistent and coherent definition:
 
 
 36
 [A]lmost every major federal action, no matter how limited in scope, has some adverse effect on the human environment.... By adding the word "significantly," ... Congress apparently was willing to depend primarily upon the agency's good faith determination as to what conduct would be sufficiently serious from an ecological standpoint to require use of the full-scale procedure.
 
 
 37
 Id. at 830 (emphasis in original); see also River Rd. Alliance, Inc. v. Corps of Eng'rs, 764 F.2d 445, 449 (7th Cir.1985) (while "significant" impact has "no determinate meaning," the statute requires the agency to make a rational prediction whether the time and expense of preparing a full EIS will be commensurate with the likely benefits of an evaluation more searching than the one made in preparing an Environmental Assessment), cert. denied, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986).
 
 
 38
 When an agency's finding of "insignificance" is challenged in court, the reviewing tribunal endeavors to determine whether the agency considered the relevant factors in a rational way:
 
 
 39
 [The] decision not to prepare an EIS can only be overturned if the decision was arbitrary, capricious, or an abuse of discretion. Judicial review of an agency's finding of "no significant impact" is not, however, merely perfunctory[,] as the court must insure that the agency took a "hard look" at the environmental consequences of its decision.
 
 
 40
 Sierra Club v. Peterson, 717 F.2d 1409, 1413 (D.C.Cir.1983); accord NRDC v. Herrington, 768 F.2d 1355, 1430 (D.C.Cir.1985); Foundation on Economic Trends v. Heckler, 756 F.2d 143, 151 (D.C.Cir.1985).
 
 
 41
 The extent of the "hard look" we demand of agencies in this context can best be limned by examining two recent decisions in which this court overturned the agency's determination not to prepare an EIS: Foundation on Economic Trends and NRDC v. Herrington. In Foundation on Economic Trends, we enjoined the National Institutes of Health (NIH) from approving the experimental release of genetically-engineered bacteria. Upon finding a "complete failure to address a major environmental concern," we concluded that NIH's Environmental Assessment "utterly fail[ed] to meet the standard of review necessary before an agency decides not to prepare an EIS." 756 F.2d at 154.
 
 
 42
 The experiment in question in Foundation on Economic Trends, involved a deliberate release of genetically altered organisms in the open environment. In the EIS accompanying NIH's general guidelines for the conduct of genetic engineering experiments, NIH itself had specifically identified the possibility of atmospheric dispersion as a major environmental concern. Id. at 148, 153. For the experiment at issue, however, the entire consideration of dispersion consisted of a statement that, although dispersion was possible, the number of dispersed organisms would be "very small." This court held that it was the agency's responsibility "to consider the possible environmental impact from dispersion of genetically altered bacteria, however small the number and however subject to procedures limiting survival." Id. at 153 (emphasis added).
 
 
 43
 The other recent case, NRDC v. Herrington, concerned a decision of the Department of Energy (DOE) not to establish energy efficiency standards for nine household appliances. 768 F.2d at 1362-63. Earlier, DOE had determined to promulgate such standards, and had concluded that the action would have no significant adverse environmental effects. Id. at 1430. After changing course and deciding not to promulgate standards, DOE relied on the earlier assessment to justify its conclusion, once again, not to prepare an EIS. As the court observed, however, it is "far from self-evidently true," id. at 1432, that "increases in energy consumption [as a consequence of the decision not to promulgate standards] are environmentally significant only if a decrease in consumption of the same amount would be environmentally significant." Id. at 1431. A "bald assertion" that the two actions were equivalent in their environmental impacts simply did not add up to reasoned decisionmaking based on a "hard look" at the relevant factors.
 
 
 44
 In these and other court rulings overturning agency decisions not to prepare detailed impact statements,[40] we did not "substitute [our] judgment for that of the agency as to the environmental consequences of its actions." Kleppe, 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21. Our more limited role is to ensure, primarily, that no arguably significant consequences have been ignored; evaluating the "impact" of those consequences on the "quality of the human environment," however, is "left to the judgment of the agency," Sierra Club, 753 F.2d at 128, and we will intervene only where that judgment is shown to be irrational.
 
 
 45
 In the instant case, petitioners argue that NHTSA did not take the requisite "hard look" at the impact of its CAFE rollback on air quality; had NHTSA done so with diligence and detachment, petitioners assert, the agency would have found a significant impact.[41] NHTSA placed primary reliance on the comments of the Environmental Protection Agency (EPA), returned in response to NHTSA's Draft Environmental Impact Statement.[42] EPA concurred in NHTSA's conclusion that the revised CAFE standard would have no significant effect on air quality.[43] In its Environmental Assessment, NHTSA quoted EPA's observation:
 
 
 46
 EPA mobile source standards for oxides of nitrogen, carbon monoxide, and hydrocarbons are expressed in grams [per] vehicle-mile travelled, not in terms of vehicle miles per gallon, and are therefore not affected by any decrease in fuel economy. Passenger car emissions will not increase due to this rule unless cars are driven more miles. Such an effect is not anticipated as a result of this rule.[44]
 
 
 47
 NHTSA was surely entitled to seek and cite EPA's expert judgment regarding air quality matters. See 40 C.F.R. Secs. 1501.1(b), 1501.6 (directing agencies responsible for Environmental Assessment to cooperate with "any other federal agency which has special expertise with respect to any environmental issue"). Petitioners take issue, however, with the implied presumption they discern in EPA's conclusion, namely, that continued compliance with the Clean Air Act emission standards means there will be no significant increase in emissions.[45] 5] In petitioners' view, "NHTSA should have explored whether such factors as increased weight or greater strains on the capacity of pollution control equipment (due to more powerful engines) might increase the actual emissions of vehicles, regardless of whether those emissions would still be within legal limits."[46]
 
 
 48
 Appreciating that the question is close, we decline to indict as arbitrary and capricious the agency's decision, made in view of time and resource constraints, to ignore in this case possible increases in emissions within the Clean Air Act limits. In an analogous context, we have held that a construction project's compliance with local zoning regulations supports the finding that the project's environmental impacts will be insignificant. Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv., 487 F.2d 1029, 1036-37 (D.C.Cir.1973); accord Preservation Coalition, Inc. v. Pierce, 667 F.2d 851, 861 (9th Cir.1982); Nucleus of Chicago Homeowners Ass'n v. Lynn, 524 F.2d 225, 231 (7th Cir.1975), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); cf. Glass Packaging Inst. v. Regan, 737 F.2d 1083, 1092 (D.C.Cir.) (finding of no significant impact is "buttressed by the conformity of the proposed federal action to federal regulations governing other aspects of that action's interrelationship with the physical environment"), cert. denied, 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984). See also 40 C.F.R. Sec. 1508.27(b)(10) (CEQ guidelines for determination of "significant impact" direct agencies to consider "[w]hether the [proposed] action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment").
 
 
 49
 NHTSA stressed that its decision regarding MY 1986, made under time pressure, set no pattern or precedent,[47] and that in making its environmental assessments in future years, it could "of course ... consider the cumulative impact of the MY 1986 rule." Brief for Respondents at 72. We count the limited scope NHTSA claims for its appraisal, and its asserted readiness to engage in continuing evaluation, significant in upholding the agency's decision against undertaking for MY 1986 a more searching inquiry.[48]
 
 
 50
 Petitioners also claim that NHTSA's finding of no significant impact violated the agency's own regulations, which direct NHTSA to prepare an EIS whenever a proposed action "may directly or indirectly result in a significant increase in the energy or fuel necessary to operate a motor vehicle." 49 C.F.R. Sec. 520.5(b)(8). But, as stated above, see supra 265, NHTSA determined that the maximum potential increase in annual fuel consumption attributable to this rule would amount to less than 0.1 percent of current consumption. Petitioners did not dispute that finding. NHTSA's conclusion that the fuel increase at stake does not rank as "significant," thus appears fully rational.
 
 
 51
 In sum, while NHTSA (and EPA) might have taken a "harder look," and NHTSA might have avoided more assiduously any prejudgment of the issue, see supra note 43, we are satisfied that NHTSA did identify the relevant areas of environmental concern and then decided rationally that its rollback ruling for MY 1986, and that year only, would not have a significant environmental impact.
 
 CONCLUSION
 
 52
 For the reasons stated, the petitions for review are denied, and NHTSA's rule lowering the MY 1986 CAFE standard from 27.5 mpg to 26 mpg is
 
 
 53
 Affirmed.
 
 SILBERMAN, Circuit Judge, dissenting in part:
 
 54
 In their opening brief, petitioners identify the precise injuries of which they complain. The "public interest" groups "bring this suit on behalf of their members who wish to choose among a wide range of fuel-efficient automobiles and who are adversely affected by NHTSA's decision insofar as it will diminish incentives for manufacturers to offer such vehicles and will lead to increased oil consumption and air pollution." The state and municipal petitioners sue "on behalf of their citizens in order to reduce air pollution and promote fuel conservation."[1] Brief for Petitioners at 3-4.
 
 
 55
 The majority holds these grievances confer standing under the EPCA in light of our opinion in Center for Auto Safety v. NHTSA, 793 F.2d 1322 (D.C.Cir.1986) ("CAS I "), which the majority says cannot rationally be distinguished from this case. The majority states that "eight members of the ten-member court [rehearing CAS II en banc] actively acknowledged that the panel decision" in CAS I "states the current law of this circuit." Maj. op. at 259 (citing Center for Auto Safety v. Thomas, 847 F.2d 843 (D.C.Cir. 1988) (en banc) ("CAS II ")). That is not strictly correct. Regarding the harm of diminution of the "range of fuel-efficient automobiles," four members of the court in CAS II explicitly reserved whether automobile manufacturers are sufficiently likely to respond to a relaxation in the fuel economy standard by "produc[ing] a smaller variety of fuel-efficient cars" so that one can say that it is not speculative to assume the injury will occur. CAS II, Buckley op. at 867; see also Williams op. at 887 And I would have held the injury was speculative. CAS II, Silberman op. at 881-82. The court was thus divided 5-5 on speculativeness, which is a part of Article III injury analysis, and therefore, while we did not overturn CAS I, we certainly did not embrace its indispensable doctrinal underpinning.
 
 
 56
 We are in my view still without dispositive precedent on this point. See CAS II, Per Curiam op. at 843 ("[I]n light of the division of this en banc court on standing, the court has agreed that neither the reinstatement of the panel decision, nor any of the separate opinions that follow, shall be considered as establishing precedent as to any aspect of standing."). For the reasons set forth in detail in my opinion in CAS II, I would hold that petitioners lack standing. It appears that all that is at stake here, even if the hypothesized events do materialize, is the interest in a particular Ford or General Motors car. See 50 Fed.Reg. at 40,530-34. It is those two manufacturers that are accused of winning unduly favorable regulatory treatment, to the general detriment of the automobile consuming public. What's good for General Motors may in fact not be good for the country, but that alone will not confer standing. See CAS II, Silberman op. at 877-78.
 
 
 57
 Petitioners also assert fuel consumption and environmental claims, varieties of injury not addressed by the majority in CAS I. See 793 F.2d at 1331-34. Nor does CAS II provide authority for the proposition that these ailments constitute Article III injury. See, e.g., CAS II, Wald op. at 849 n. 8. It seems apparent to me, moreover, that neither allegation is sufficient to confer standing under the EPCA.[2] A general interest in seeing that less gasoline is consumed in America cannot be vindicated in the federal courts. See Diamond v. Charles, 476 U.S. 54, 65, 106 S.Ct. 1697, 1705, 90 L.Ed.2d 48 (1986). Indeed, automobile manufacturers and, in turn, consumers could respond to a court order raising the fleet average standard in ways that might leave gasoline consumption unchanged or even increase it. Manufacturers might, for example, "outsource" production or lower the price of their cars with the highest mileage ratings, thereby increasing total sales of automobiles and thus fossil fuel consumption. See CAS II, Silberman op. at 886. Consumers might react to increased fuel efficiency by driving more. The causation and redressability prongs of standing are unmet by these allegations.
 
 
 58
 This court expended tremendous energy on this question without a firm resolution, and it may be tempting simply to ignore the matter in hopes that technology will make it obsolete. Such an approach would shirk our duty, however, and I hope that this court will continue to address questions of standing under the EPCA with undiminished vigor.
 
 
 
 [1]
 Pub. L. No. 94-163, 89 Stat. 871 (1975). The agency, in its rulemaking, referred to this legislation as the Cost Savings Act
 
 
 [2]
 50 FED.REG. 40528 (1985), codified at 49 C.F.R. Sec. 531.5 (1986)
 
 
 [3]
 15 U.S.C. Sec. 2002(a)(1) (1982)
 
 
 [4]
 Id. Sec. 2002(a)(4)
 
 
 [5]
 Id. Sec. 2002(e). These criteria are set out infra in the text of this opinion at note 11
 
 
 [6]
 Id. Sec. 2002(e)(4)
 
 
 [7]
 42 U.S.C. Secs. 4321 et seq. (1982)
 
 
 [8]
 5 U.S.C. Sec. 706(2)(A) (1982)
 
 
 [9]
 See 15 U.S.C. Sec. 2002(a)(1). "Average fuel economy" is defined in id. Sec. 2003(a)(1)
 
 
 [10]
 Id. Sec. 2002(a)(4)
 
 
 [11]
 Id. Sec. 2002(e)
 
 
 [12]
 Id. Sec. 2008(b)(1)
 
 
 [13]
 The Secretary of Transportation has delegated to the Administrator of NHTSA responsibility for the automotive fuel economy program. See 41 FED.REG. 25015 (1976)
 
 
 [14]
 50 FED.REG. at 40533
 
 
 [15]
 Id
 
 
 [16]
 Id
 
 
 [17]
 Id. at 40546
 
 
 [18]
 Id
 
 
 [19]
 Id
 
 
 [20]
 Id. at 40549; see also NHTSA Environmental Assessment for the Corporate Average Fuel Economy Standards for Passenger Cars, Model Year 1986 (1985) (Environmental Assessment), Joint Appendix (J.A.) at 968-99
 
 
 [21]
 See 40 C.F.R. Secs. 1501.4(a)-(e), 1508.9(a) (1986) (guidelines for determining whether to prepare an EIS)
 
 
 [22]
 This follows from Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), where the Supreme Court formulated a three-part test for determining whether an organization has standing to present the claims of its members; the test requires, inter alia, that the claims be such that the organization's members would be able to assert them on their own behalf. See id. at 343, 97 S.Ct. at 2441
 
 
 [23]
 See Reply Brief for Petitioners at 4-5 (state and municipal petitioners "will have less choice when they seek to purchase fuel-efficient automobiles for their own fleets"); see also Second Supplemental Brief for Respondent at 3 (recognizing that would-be purchasers of fuel-efficient vehicles "may assert standing on the same basis as the hypothetical individual purchasers in [CAS-I ]")
 
 
 [24]
 Second Supplemental Brief for Respondent at 4
 
 
 [25]
 NHTSA's argument could also be stated in "mootness" terms. The doctrines of standing and mootness are closely related in certain contexts. See, e.g., United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980) (mootness defined as "standing set in a time frame" wherein the litigant's "personal stake in the outcome" must continue throughout the litigation); see generally 13 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 3531.6, at 464, 480 (2d ed. 1984) (noting resemblance between the "redressability" criterion and mootness doctrine). Whatever label is put upon NHTSA's argument, we are satisfied, as discussed in the text below, that petitioners have presented the court with a still "live" matter in which, under current law of the circuit, they have a sufficient personal stake to satisfy the "case or controversy" requirement of Article III
 
 
 [26]
 See, e.g., Richland Park Homeowners Ass'n v. Pierce, 671 F.2d 935, 941 (5th Cir.1982); Montgomery Envtl. Coalition v. Costle, 646 F.2d 568, 578 (D.C.Cir.1980)
 
 
 [27]
 Petitioners' standing on the NEPA claims thus rests on the prospect that NHTSA would rescind its CAFE "rollback" were the environmental consequences of the rollback spelled out in more detail in an EIS: only this would supply the required causal nexus between the agency's action--failure to prepare an EIS--and petitioners' "environmental" injury--lowered air quality as a result of the modified CAFE standard. Were agency reaction to the EIS not a real possibility, by virtue, for example, of a statutory command that NHTSA not consider environmental consequences in determining the maximum feasible fuel economy level, petitioners' standing would have to be denied. See, e.g., Flint Ridge Dev. Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 787-88, 96 S.Ct. 2430, 2437-38, 49 L.Ed.2d 205 (1976) (NEPA's instruction that all federal agencies must comply with the impact statement requirement "to the fullest extent possible" can be countermanded "where a clear and unavoidable conflict in statutory authority exists"); NRDC v. Berklund, 609 F.2d 553, 558 (D.C.Cir.1979); Pacific Legal Found. v. Andrus, 657 F.2d 829, 836 (6th Cir.1981) (EIS need not be prepared where prescription of Endangered Species Act specifically prevents the Secretary of Interior from considering environmental impact; EIS preparation would be a "waste of time"). There is no conflict here, however, between reacting to the environmental consequences an EIS might disclose and the factors NHTSA must weigh under EPCA, see 15 U.S.C. Sec. 2002(e) (1982); indeed, NHTSA has itself interpreted the factors it must consider in setting CAFE standards as including environmental effects:
 The "effect of other Federal motor vehicle standards on fuel economy" [15 U.S.C. Sec. 2002(e)(3) ] requires an analysis of the unavoidable adverse effects on fuel economy of compliance with emission ... standards.... [T]his analysis projects the impact on fuel economy of the use by the manufacturers of the most fuel efficient emission control systems. Finally, "the need of the Nation to conserve energy" [15 U.S.C. Sec. 2002(e)(4) ] requires consideration of the ... environmental ... implications of our need for large quantities of petroleum....
 
 
 [42]
 FED.REG. 63188 (1977) (emphasis added)
 
 
 [28]
 Brief for Petitioners at 14
 
 
 [29]
 50 FED.REG. at 40545
 
 
 [30]
 Id. at 40543
 
 
 [31]
 Id. at 40533
 
 
 [32]
 Id. at 40544
 
 
 [33]
 Brief for Petitioners at 22
 
 
 [34]
 Id. at 25
 
 
 [35]
 Id. at 20-25
 
 
 [36]
 See 50 FED.REG. at 40538; see also Comments of U.S. Department of Commerce, Docket FE-85-1-NO1, J.A. at 321-44; Comments of U.S. Department of Energy, Docket FE-85-1-NO2, J.A. at 483-86; Comments of Council of Economic Advisers, Docket FE-85-01-N2, J.A. at 662-721
 
 
 [37]
 50 FED.REG. at 40546 (emphasis in original)
 
 
 [38]
 Id
 
 
 [39]
 Following both its own regulations, 49 C.F.R. Secs. 520.1 et seq., and those promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. Secs. 1501.1 et seq., NHTSA first prepared a "Draft Environmental Impact Statement" (DEIS) examining the environmental consequences of its proposed rule. 49 C.F.R. Sec. 520.3(c). After a period of comment within and outside the agency, see id., NHTSA concluded that the proposed rule would not have a significant effect on the environment, and accordingly converted the DEIS into a final "Environmental Assessment" incorporating a finding of no significant impact. See 49 C.F.R. Secs. 520.3(a), 520.21(f)(2); see also 40 C.F.R. Secs. 1501.4(b)-(e), 1508.9, 1508.13
 
 
 [40]
 See, e.g., Sierra Club v. Peterson, 717 F.2d 1409, 1414-15 (D.C.Cir.1983) (overturning Interior Department's failure to prepare EIS in connection with issuance of oil and gas leases; agency entirely failed to consider environmental damage which could not be mitigated by post-drilling controls); Southwest Neighborhood Assembly v. Eckard, 445 F.Supp. 1195, 1199-1201 (D.D.C.1978) (agency failed to take a hard look at environmental consequences of decision to lease building for use by federal employees; agency "failed to quantify" project's impact on air quality and traffic congestion)
 
 
 [41]
 See Brief for Petitioners at 60-76
 
 
 [42]
 See supra note 39. Of the current petitioners, only California commented on NHTSA's Draft Environmental Impact Statement. J.A. at 841
 
 
 [43]
 The Draft Environmental Impact Statement indicates a troubling predisposition on NHTSA's part. Prior to receiving the EPA analysis of air quality impacts, and without offering any other substantiating information, NHTSA stated that its proposed rule amending the MY 1986 CAFE standard would occasion "little change in air quality." Draft Environmental Impact Statement p 3.2.2, J.A. at 511. NHTSA should inquire before it concludes. Cf. Friends of the River v. FERC, 720 F.2d 93, 106 (D.C.Cir.1983) (noting importance of EIS requirement in "inhibit[ing] post hoc rationalizations of inadequate environmental decisionmaking")
 
 
 [44]
 Environmental Assessment at 21, J.A. at 990
 NHTSA also calls our attention to EPA's documentation of the absence of a direct correlation between fuel efficiency and quantity of emissions: "a more fuel-efficient car may in fact be 'dirtier' than a less fuel efficient vehicle." Brief for Respondents at 66-67.
 
 
 [45]
 See Brief for Respondents at 67 ("The Clean Air Act standards are strong evidence of a congressional judgment that emission levels below these limits do not rise to the level of having a significant impact on the environment.")
 
 
 [46]
 Brief for Petitioners at 68 (emphasis in original)
 
 
 [47]
 Environmental Assessment at 1, 10, J.A. at 970, 979
 
 
 [48]
 NHTSA observed that no party raised during the rulemaking process the proposal that the agency consider "whether actual emissions from MY 1986 automobiles, although in compliance with Clean Air Act standards, would result in an increase from current emission levels." Brief for Respondents at 59. We take this to mean that any EPA-NHTSA presumption of insignificant impact when Clean Air Act limits are not exceeded is a rebuttable one
 
 
 [1]
 As the majority correctly notes, petitioners asserted in their Reply Brief that the state and municipal petitioners are also injured in their role as automobile consumers. See Maj. op. at ----
 
 
 [2]
 Standing analysis is different under the NEPA, which confers a procedural right to have environmental impacts considered. A party is therefore "aggrieved" if an agency fails to take the mandated procedural steps, provided the party actually asserts a bona fide environmental interest and is within the geographical area where the suspected impact is likely to occur. See City of Davis v. Coleman, 521 F.2d 661, 670-71 (9th Cir.1975); see also Robinson v. Knebel, 550 F.2d 422, 425 (8th Cir.1977) (pecuniarily motivated parties may bring challenge under NEPA "provided that their environmental concerns are not so insignificant that they ought to be disregarded altogether"); Gifford-Hill & Co. v. FTC, 523 F.2d 730 (D.C.Cir.1975)