901 F.2d 107
 284 U.S.App.D.C. 1, 20 Envtl. L. Rep. 20,464
 COMPETITIVE ENTERPRISE INSTITUTE, et al., Petitioners,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, Respondent,
Automobile Importers of America, Inc., Ford Motor Company,
General Motors Corporation, Intervenors.
COMPETITIVE ENTERPRISE INSTITUTE and Consumer Alert, Petitioners,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, Respondent,
General Motors Corporation, Automobile Importers of America,
Inc., Ford Motor Company, the City of New York, Intervenors.
 Nos. 86-1646, 89-1278.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 19, 1989.
Decided Jan. 19, 1990.
 
 Sam Kazman for petitioners Competitive Enterprise Institute, et al., in Nos. 86-1646 and 89-1278.
 John A. Bryson and Barbara C. Biddle, Attys., Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., Dirk D. Snel, John F. Cordes, Attys., Dept. of Justice, Kenneth N. Weinstein and Susan L. Rives, Attys., Nat. Highway Traffic Safety Admin., Washington, D.C., were on the joint brief for respondent.
 Edward W. Warren, with whom Frederick M. Rowe, John Gibson Mullan, Washington, D.C., Thomas L. Arnett, Detroit, Mich., for Gen. Motors Corp., Charles H. Lockwood, II and John T. Whatley, for Auto. Importers of America, Inc., James A. Brown, for Ford Motor Co., were on the joint brief for intervenors Gen. Motors Corp., et al., in all cases. Arthur F. Sampson, III, David Norrell, Washington, D.C. and William L. Weber, Jr., also entered appearances for Gen. Motors Corp.
 Peter L. Zimroth, New York City, was on the brief for intervenor, City of New York in No. 89-1278.
 Before WALD, Chief Judge, and RUTH B. GINSBURG and D.H. GINSBURG, Circuit Judges.
 
 
 1
 Opinion for the Court filed by Chief Judge WALD.
 
 
 2
 Concurring opinion filed by Circuit Judge D.H. GINSBURG.
 
 
 3
 PETITION FOR REVIEW OF ORDERS OF THE NATIONAL HIGHWAY
 
 TRAFFIC SAFETY ADMINISTRATION
 WALD, Chief Judge:
 
 4
 Competitive Enterprise Institute ("CEI")[1] and Consumer Alert[2] petitioned this court for review of orders of the National Highway Traffic Safety Administration ("NHTSA") lowering the minimum Corporate Average Fuel Economy ("CAFE") standards for passenger cars manufactured in model years ("MYs") 1987, 1988, and 1989.[3] The NHTSA orders amend the CAFE standards by reducing them from 27.5 miles per gallon ("mpg") to 26 mpg for MYs 1987-88, and to 26.5 mpg for MY 1989.[4] Petitioners claim that in refusing to set the CAFE standards below these levels, NHTSA inadequately considered the adverse effects of its actions on the safety of occupants of the affected passenger vehicles. In so doing, petitioners claim, NHTSA violated both the Energy Policy and Conservation Act of 1975 ("EPCA"), which governs the setting of mandatory fuel economy standards for passenger cars, and the National Environmental Policy Act ("NEPA"), which requires agencies to take environmental considerations into account when proposing major federal action.
 
 
 5
 In EPCA, Congress established 27.5 mpg as the presumptive CAFE standard for 1985 and thereafter. Congress also gave NHTSA authority to amend the statutorily-prescribed average fuel economy standard for a given model year to its maximally-feasible level. See 15 U.S.C. Sec. 2002(a)(4). In their primary challenge to NHTSA's action under EPCA, petitioners claim that NHTSA's decision to set the maximally-feasible standards at 26 and 26.5 mpg for MYs 1987-88 and 1989, respectively, was arbitrary and capricious because evidence before the agency on the safety consequences of the CAFE standards compelled standards below those levels.
 
 
 6
 Petitioners claim that NHTSA also violated NEPA by failing to prepare an environmental impact statement prior to amending the CAFE standards. NEPA requires a detailed environmental impact statement ("EIS") on every proposed major federal action that would "significantly affect the quality of the human environment." 42 U.S.C. Sec. 4332. Petitioners claim that the adverse safety consequences of the CAFE standards as amended constitute just such a major federal action that is significantly affecting the quality of the human environment.
 
 
 7
 This case initially raises issues concerning petitioners' standing to bring these claims. Consumer Alert claims standing under EPCA on behalf of its members; the organization asserts that its members are hampered in their ability to purchase larger passenger cars because of NHTSA's decision not to reduce the CAFE standards below 26 and 26.5 mpg. The two organizations claim standing under both EPCA and NEPA based on asserted injury to their institutional, information-dissemination activities. They claim that NHTSA's inadequate assessment of the adverse safety consequences of the CAFE standards in its statement of basis and purpose in support of the Final Rule under EPCA, and its failure to consider safety at all in an EIS under NEPA, have impeded their ability to provide information to the public on CAFE's true costs. The government challenged petitioners' standing under both EPCA and NEPA.
 
 
 8
 We find that petitioner Consumer Alert has standing to challenge the EPCA rulemaking on behalf of its members, and, therefore, need not decide whether either organization has alleged sufficient injury to its activities to sustain standing under EPCA on its own behalf. On the merits of the EPCA claim, we find that NHTSA's decision to set the CAFE standards at the 26 and 26.5 mpg levels was not arbitrary and capricious, but was rather the product of reasoned consideration of the safety implications of its decision. Finally, we conclude that neither organization has standing under NEPA.
 
 I. STANDING UNDER EPCA
 
 9
 An organization has standing to sue on behalf of its members when: (a) its members would have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. See Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); see also International Union, UAW v. Brock, 477 U.S. 274, 288-90, 106 S.Ct. 2523, 2531-33, 91 L.Ed.2d 228 (1986). Consumer Alert unquestionably meets the second and third parts of this test. Germaneness is satisfied by a "mere pertinence" between litigation subject and an organization's purpose. Humane Soc. of the U.S. v. Hodel, 840 F.2d 45, 58 (D.C.Cir.1988); accord Hazardous Waste Treatment Council v. EPA, 861 F.2d 277 (D.C.Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989). Consumer Alert seeks to protect its members' interest in the widest possible consumer choice of large passenger vehicles. This interest is germane to its organizational purpose, which includes defending and expanding consumer choice in the marketplace, and exposing the hidden costs of unwarranted government regulations. In addition, no circumstances exist that would require individual members to participate in the case. See Center for Auto Safety v. NHTSA, 793 F.2d 1322, 1329 n. 44 (D.C.Cir.1986) ("CAS I").
 
 
 10
 The critical inquiry, therefore, is whether Consumer Alert satisfies the first Hunt criterion, i.e., whether its members would have standing to sue in their own right. Accordingly, we turn to an analysis of Consumer Alert members' standing under Article III.
 
 A. Constitutional Requirements
 
 11
 Article III of the Constitution limits the power of the courts to the resolution of "cases" and "controversies." See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). Under currently governing Supreme Court precedent, these limits are embodied in the requirements that a party seeking review must show "actual or threatened injury," Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), that "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 41, 38, 96 S.Ct. 1917, 1926, 1924, 48 L.Ed.2d 450 (1976).
 
 1. Injury-in-Fact
 
 12
 To maintain a court challenge to NHTSA's action, Consumer Alert's members must be able to show that they "have been or will in fact be perceptibly harmed by the challenged agency action." United States v. Students Challenging Regulatory Agency Procedures ("SCRAP"), 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). The harm can be actual or threatened, see Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758, but it must be "distinct and palpable"; mere harm to an ideological interest will not suffice. See Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).
 
 
 13
 Consumer Alert claims an injury that is the "opposite side of the coin" of the injury found cognizable in CAS I, 793 F.2d at 1331-34. See Brief for Petitioner at 10. In CAS I, this court found that the Center for Auto Safety ("CAS") had standing to challenge NHTSA's decision to reduce the CAFE standards for light trucks.[5] CAS claimed that lower CAFE standards would reduce manufacturers' incentives to produce fuel-efficient vehicles by removing the threat of civil penalties that would have been assessed for failure to meet the higher standards. As a result, CAS alleged, its members would suffer injury in the form of a restricted opportunity to purchase fuel-efficient vehicles. We found these allegations sufficient to establish cognizable injury.
 
 
 14
 Consumer Alert alleges that its members have been injured in a comparable manner. Its members seek the opportunity to buy larger passenger vehicles; they are hindered in their ability to do so, the organization asserts, because the CAFE standards restrict the production of such vehicles, thereby reducing their availability and increasing their price, and cause a downsizing of their dimensions.
 
 
 15
 In affidavits, Consumer Alert's members state that they have looked for, but have been unable to find new cars of large size, such as station wagons, in a price range they could afford. Consumer Alert's president stated that she had been contacted by many members who have been frustrated by the declining availability and high prices of large cars, which they prefer for reasons of safety, comfort, and performance. For standing purposes, these assertions adequately support Consumer Alert's claims of injury on behalf of its members.
 
 
 16
 Intervenors Automobile Importers of America, Inc., Ford Motor Company, and General Motors Corp. ("Intervenors") claim that Consumer Alert's allegations do not establish a "distinct and palpable" injury. Brief for Intervenors at 22. Intervenors suggest that since EPCA regulates only fleet average mileage, petitioners cannot identify any particular harm because they cannot point to any specific car or model that they have been prevented from buying because of the CAFE levels. As a result, they claim, petitioners allege merely a subjective, ideological injury, insufficient to support Article III standing.
 
 
 17
 Intervenors' assertions contradict this court's standing decisions in CAS I and Public Citizen, where we concluded that petitioners' reduced opportunity to purchase fuel-efficient vehicles made out a cognizable constitutional injury. CAS I, 793 F.2d at 1332.[6] We determined that a lost opportunity to purchase vehicles of choice is sufficiently personal and concrete to satisfy Article III requirements. Accordingly, we agree with Consumer Alert that its members have suffered injury comparable to, albeit on the "opposite side" of the coin from, that sustained by CAS members in CAS I and Public Citizen.
 
 2. Causation and Redressability
 
 18
 a. General Principles. The questions whether the injury alleged is "fairly traceable" to the purportedly illegal conduct and whether the relief requested is "likely to redress" the injury substantially overlap where the petitioners seek only the cessation of the illegal conduct. See CAS I, 793 F.2d at 1334; see also Allen v. Wright, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984). That is certainly true here, although the government and intervenors primarily challenge Consumer Alert's showing on redressability grounds.
 
 
 19
 To satisfy the causation and redressability requirements, Consumer Alert must show that its members' restricted opportunity to purchase larger passenger vehicles is fairly traceable to the CAFE standard as set by NHTSA and is likely to be ameliorated by a judicial ruling directing the agency to take further account of safety concerns.
 
 
 20
 We note at the outset that the standing determination must not be confused with our assessment of whether the party could succeed on the merits. See Women's Equity Action League v. Cavazos, 879 F.2d 880 (D.C.Cir.1989); Public Citizen v. Federal Trade Comm'n, 869 F.2d 1541, 1549 (D.C.Cir.1989). For standing purposes, petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978); see also Autolog Corp. v. Regan, 731 F.2d 25, 31 (D.C.Cir.1984). This is true even in cases where the injury hinges on the reactions of third parties, here the auto manufacturers, to the agency's conduct. See National Wildlife Federation v. Hodel, 839 F.2d 694, 705 (D.C.Cir.1988). In such cases, the alleged injury must be traced back through the actions of the intermediary parties to the challenged government decision. See Public Citizen, 869 F.2d at 1547 n. 9. This case falls well within the range of those cases in which the government's action has been found substantially likely to cause the petitioners' injury despite the presence of intermediary parties. See National Wildlife Federation, 839 F.2d at 706-16 (environmental organization had standing where challenged mining regulations, as interpreted and applied by the states and mining industry, could cause injury to its members' use and enjoyment of the environment); Community Nutrition v. Block, 698 F.2d 1239, 1248 (D.C.Cir.1983), rev'd on other grounds, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) (within complex structure of dairy market, consumers' contention that if milk handlers were not required to make a compensatory payment they would pass the savings on to consumers was reasonable).
 
 
 21
 The evidence supporting this causal link comes not from reliance upon congressional factfinding, as was the case in CAS I, but instead from evidence contained in the agency's own factfinding. See CAS I, 793 F.2d at 1334-35. While a match between the statutory objective behind the agency's regulation and the alleged injury can facilitate finding a causal link between the agency's conduct and the petitioners' injury, see, e.g., National Wildlife Federation, 839 F.2d at 708-09, such a match is not essential for standing purposes. Here, we need not rely on congressional predictions of how auto manufacturers are likely to react to lower CAFE standards. Instead, we can look to the evidence in the administrative record itself as supporting the causal link, evidence derived from the agency's own experience and sound market analysis. See Animal Welfare Institute v. Kreps, 561 F.2d 1002, 1010 (D.C.Cir.1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978) (factual evidence in the administrative record showed that South African seal hunting practices "will respond" to stricter enforcement of the Marine Mammal Protection Act) (emphasis in original).
 
 
 22
 b. Agency Factfinding. The imposition of CAFE standards on manufacturers has been shown to affect the availability of larger and heavier vehicles in two principal ways: by causing the downsizing of vehicles which are produced (weight and size reductions), and by shifting the vehicle mix available to the automobile consumer. NHTSA has accumulated substantial evidence on these effects because they are integral to determining whether "the maximum feasible average fuel economy level for [a given] model year," is "technologically feasible" and "economically practicable" for the automobile industry. See 15 U.S.C. Sec. 2002(a)(4) and (e) (listing four factors NHTSA must take into account as technological feasibility; economic practicability; effect of other Federal motor vehicle standards on fuel economy; and the need of the nation to conserve energy).
 
 
 23
 From its earliest CAFE rulemakings, NHTSA has recognized that the ability of auto manufacturers to downsize vehicles would determine to a large extent the maximally-feasible average fuel economy that those manufacturers could meet for a given model year. See Final Rule, Passenger Automobile Average Fuel Economy Standards for MYs 1981-84, 42 Fed.Reg. 33,534, 33,537 (June 30, 1977) ("The most obvious method for improving fuel economy is to make the passenger automobile lighter."). In the decade since, auto manufacturers have reduced average car weight by 1000 pounds, which along with technological changes, has resulted in nearly doubled average fuel economy. 51 Fed.Reg. at 35,603 & 35,594. When the agency reexamined the relationship between fuel economy and vehicle size and weight in its Final Regulatory Impact Analysis for the MY 1989 CAFE standards ("FRIA-MY 1989"), NHTSA again concluded that vehicle weight reduction is "probably the most powerful technique for improving vehicle fuel economy.... Each 10 percent reduction in weight improves the fuel economy of a new vehicle design by approximately 8 percent." Joint Appendix ("J.A.") at 234. This evidence strongly supports petitioners' claim that the imposition of CAFE standards at current levels is causally related to the size and weight of available vehicles.
 
 
 24
 In addition to downsizing, NHTSA's administrative factfinding demonstrates that automobile manufacturers are likely to meet their CAFE obligations by adjusting the product mix which they offer to consumers. To ensure that their average fleet fuel standards meet the CAFE requirements in any given year, manufacturers have made fewer large vehicles available, or have ceased producing larger vehicles altogether. In fact, the proportion of cars in the mid- and full-size classes has declined from over half the fleet in MY 1978 to 36 percent in MY 1987, while the compact size class has grown from under 7 percent in MY 1978 to 40 percent in MY 1987. FRIA-MY 1989, J.A. at 237.
 
 
 25
 NHTSA determined, for example, that the primary reason Chrysler is able to achieve a higher CAFE than GM and Ford is that it no longer competes in all the market segments in which GM and Ford sell cars. 51 Fed.Reg. at 35,601. According to GM, Chrysler is now in a better position than GM and Ford with respect to meeting CAFE requirements because it has stopped producing larger cars almost entirely, while Ford and GM have continued to provide a full line of cars. Statement of George Eads, Vice President & Chief Economist, General Motors Corporation: "The Corporate Average Fuel Economy Regulation: Is it Time to Declare 'Victory'?," reprinted in Proceedings: The Colloquium by and for Regulatory Analysts, 1987-88. In fact, Chrysler does not offer any vehicles which are defined by the EPA as "large cars" or "large station wagons," while those vehicles account for 20 to 25 percent of Ford's and GM's sales. 51 Fed.Reg. at 35,610.
 
 
 26
 In its MY 1986 rulemaking, NHTSA concluded that 27.5 mpg was not a "feasible" fuel-efficiency standard in large part because Ford and GM would be unable to meet that standard without restricting their product mix so as not to offer as many large vehicles. Again, in its MYs 1987-88 rulemaking proceeding, NHTSA concluded that the only actions available to GM and Ford in the near-term to achieve CAFE levels of 27.5 mpg for MYs 1987-88 would involve product restrictions which "would result in significant adverse economic impacts and restrict consumer choice to an unreasonable degree." 51 Fed.Reg. at 35,615.
 
 
 27
 Further evidence demonstrating the relationship between fuel economy standards and restrictions on the production of larger vehicles can be found in the public comments in the rulemaking from commenters who were not focusing on size-weight-safety concerns, but who were concerned about the economic consequences of forcing manufacturers to meet CAFE standards. These commenters obviously concentrated on the size and weight restrictions likely to result at the statutorily-prescribed 27.5 mpg level, since that is the level that would have applied automatically if NHTSA decided to take no action in response to its rulemakings. Nevertheless, they substantiate petitioners' claim that in striving to meet the CAFE standards, manufacturers are adjusting vehicle size and weight and product mix. Many of the commenters predicted that the 27.5 mpg standard would have some adverse effect on large vehicle production. The Bureaus of Consumer Protection, Competition, and Economics of the Federal Trade Commission ("FTC"), for example, assessed the economic consequences of a 27.5 mpg standard through a theoretical model. The FTC staff concluded that "[t]he price of large cars may rise by as much as 22 percent as large-car production drops by 1.7 million units." 51 Fed.Reg. at 35,598. The National Urban League commented that a standard above 26 mpg could encourage American manufacturers to drop or restrict production of family-size cars. 51 Fed.Reg. at 35,598. GM argued that any standard above 26 mpg would force it to limit consumer choice of vehicle mix. Id. at 35,597. And the National Automobile Dealers Association ("NADA") urged that the 27.5 mpg standard "would result in manufacturers restricting the availability of larger, less fuel-efficient vehicles." Id.
 
 
 28
 In these rulemakings, NHTSA concluded that, on balance, the restriction of large vehicle production and vehicle downsizing that might occur at a CAFE level of 26 mpg, 26.5 mpg, or even 27.5 mpg would not be significant enough to produce sufficiently adverse safety consequences so as to warrant CAFE standards below those levels. We will review that determination on the merits in Part II of this opinion. Nevertheless, for standing purposes, the record amply supports the link between the availability of large passenger vehicles for Consumer Alert's members (the injury alleged by Consumer Alert), and the constraints placed on manufacturers by the CAFE standards. As NHTSA stated in the commentary to its Final Rule for MYs 1987-88:
 
 
 29
 While the agency has concluded that CAFE standards in the 26.0 mpg to 27.5 mpg range need not have a significant effect on safety, ... [NHTSA] recognizes that to the extent that manufacturers may, in the short run, be able to improve their CAFE only by product restrictions, individual consumers could be denied the opportunity to purchase the larger, safer cars that they may desire.
 
 
 30
 51 Fed.Reg. at 35,613. And in its MY 1989 rulemaking, NHTSA described in explicit terms the "CAFE price" which manufacturers have paid for complying with the CAFE standards. Because manufacturers have continued to compete in the large vehicle market they have experienced difficulty meeting the CAFE standards. In NHTSA's words:
 
 
 31
 [I]t is clear from Ford's experience that the CAFE of a company that serves [the large car] market segment will be lower than if the company does not serve that market. This is the segment where the U.S. manufacturers have traditionally been the strongest, but the experience of both Ford and GM over the last few years proves that there is a CAFE price to pay for serving that market, and a price in reduced competitiveness for not serving that market.
 
 
 32
 53 Fed.Reg. at 39,278. Finally, the Department of Commerce, Federal Trade Commission, and the Council of Economic Advisors explain the relationship in this way:
 
 
 33
 [W]hen the U.S. manufacturers are forced to respond to high CAFE standards, they must consider adopting pricing and marketing strategies on their models which distort consumer demand in order to discourage buyers from the larger or luxury models with lower fuel economy and encourage the purchase of the smaller, more fuel-efficient models.
 
 
 34
 53 Fed.Reg. at 39,277.
 
 
 35
 Thus, there is overwhelming evidence to support a conclusion that the auto manufacturers' product design and product mix decisions are not made substantially independent of the government's imposition of fuel economy standards. In the face of such evidence, we must be wary of falling into "the familiar trap" of "bootstrapping" standing analysis to issues that are controverted on the merits. See Public Citizen v. Federal Trade Comm'n, 869 F.2d 1541, 1549 (D.C.Cir.1989). In that case, we rejected the argument that because the FTC found that the benefits of tobacco warnings on promotional items are minimal, ipso facto no one could show the necessary injury to challenge their omission. Id. at 1549. Similarly, we must not accept NHTSA's determination on the merits, that the CAFE standards will not cause sufficient downsizing or vehicle mix restrictions to affect vehicle safety, as predetermining petitioners' standing to challenge that decision. Therefore, we conclude that the restricted availability of larger passenger vehicles to Consumer Alert's members can, for standing purposes, be "fairly traced" to the level of fuel economy auto manufacturers must achieve to comply with NHTSA's CAFE standards.
 
 
 36
 c. Special Redressability Concerns. The government and intervenors argue that even if a causal link exists between CAFE standards and car sizes petitioners lack standing because judicial invalidation of NHTSA's standard-setting as "arbitrary and capricious" cannot redress petitioners' lost opportunity to purchase larger passenger vehicles. The gist of this argument is that redressability is lacking because the auto manufacturers' response to a lowering of CAFE standards might take any of several plausible forms besides returning to production of larger, heavier vehicles.
 
 
 37
 The record belies this claim in two respects: first, based on past experience, the evidence shows that manufacturers are likely to respond to lower CAFE standards by continuing or expanding production of larger, heavier vehicles; second, consumer demand has shifted back toward larger vehicles, so that, unconstrained by the CAFE standards, manufacturers are substantially likely to respond to market forces, and to meet that consumer demand by providing a wider range of large passenger vehicles.
 
 
 38
 Based on experience with the EPCA's credit and penalty scheme, when manufacturers receive CAFE credits for exceeding CAFE standards in a given year, they are likely to respond in future years by producing fewer fuel-efficient vehicles. Between MYs 1980 and 1982, for example, Ford and GM amassed hundreds of millions of dollars of CAFE credits after demand for their small cars peaked. In the following three years, the companies reacted by continuing to produce larger vehicles which they had originally planned to phase out and delaying the introduction of lighter, more fuel-efficient vehicles. See Passenger Automobile Average Fuel Economy Standards Model Year 1986, 50 Fed.Reg. 40,528, 40,531 (Oct. 4, 1985); see also CAS II, 847 F.2d at 857 n. 16. It is reasonable to assume that auto manufacturers would be likely to respond to lower CAFE standards in the same fashion.
 
 
 39
 The administrative record is replete with evidence that manufacturers face consumer demand for larger vehicles. In its MY 1986 rulemaking, NHTSA concluded that the only actions available to Ford and GM to improve their fuel economy for MY 1986 would have involved product restrictions, because, among other things, "there had been a substantial shift in consumer demand toward larger cars and engines," and away from the more fuel-efficient sales mixes on which GM and Ford had based their CAFE projections. 50 Fed.Reg. at 40,528. This shift occurred despite Ford and GM's significant marketing efforts to shift consumers in the other direction, toward their more fuel-efficient vehicles. Notice of Proposed Rulemaking, MYs 1987-88, 51 Fed.Reg. at 2918. In addition, both GM and Ford have already raised the prices of their larger cars and engines "as part of their efforts to improve CAFE" by discouraging large car sales. 51 Fed.Reg. at 35,604. In the absence of such regulatory restraints, the price is at least substantially likely to drop back to meet consumer demand, thus making larger vehicles more readily available to Consumer Alert's members.
 
 
 40
 In public hearings on the CAFE standards, both Ford and GM conceded that they had made business decisions to shift away from larger vehicles because of CAFE pressures, and that such decisions had caused them to lose market share which they hope to regain. NHTSA, Public Meeting on Passenger Car Fuel Economy Standard, Sept. 14, 1988, J.A. at 574-75, 586. Both manufacturers explained their inability to meet the projected 27.5 mpg standard because of market shifts and economic changes, principally lower gasoline prices and interest rates, that have shifted consumer demand toward larger, higher performance vehicles. 53 Fed.Reg. at 39,281. While this evidence does not guarantee that these manufacturers would respond to lower CAFE standards by making available larger passenger vehicles, it more than suffices for standing purposes to show that reduced standards would be substantially likely to redress petitioners' alleged injury.
 
 
 41
 Finally, the government claims that Consumer Alert fails to meet the redressability standard because of the nature of the relief it requests. Consumer Alert asks this court to ensure that, in the event of a remand, NHTSA could consider only whether to reduce the standards below the levels to which they have been amended. See Brief for Petitioners at 38. The government claims that since a court may not direct an agency to issue a particular rule on remand, Consumer Alert has failed to demonstrate redressability. We find this contention irrelevant to the redressability question. Petitioners need not prove that granting the requested relief is certain to redress their injury, especially where some uncertainty is inevitable. See International Ladies' Garment Union v. Donovan, 722 F.2d 795, 811 (D.C.Cir.1983) ("ILGWU "); National Wildlife Federation, 839 F.2d at 705. According to petitioners, if NHTSA had adequately assessed the safety impacts of the CAFE standards, it would have been likely to conclude that its proposed standards were too high. A remand that would leave the agency free to exercise its discretion in a proper manner, then, could lead to agency action that would redress petitioners' injury, even if it were to require initiation of a new rulemaking proceeding.
 
 
 42
 NHTSA has already shown a willingness to entertain comments on the potential effects of a standard lower than 26 mpg, the low end of the range it originally proposed. In its Supplemental Notice of Proposed Rulemaking for MYs 1987-88, for example, NHTSA solicited comments on GM's argument that a CAFE standard should be considered "economically practicable" if it permits a manufacturer to earn CAFE credits and avoid noncompliance with past standards. 51 Fed.Reg. at 27,224 (July 30, 1986). NHTSA requested commenters to address whether their position on the issue would differ if adoption of GM's position would necessitate setting the standard below 26 mpg for either model year. 51 Fed.Reg. at 27,226. This suggests that if this court were to order NHTSA to reconsider the relationship between vehicle size and weight and safety, the agency would at least be willing to consider a standard below 26 mpg. Therefore, we reject the government's and intervenors' objections on redressability grounds.
 
 B. Prudential Limitations
 
 43
 Having shown that Consumer Alert satisfies the constitutionally-compelled standing requirements, we turn to the question whether prudential limits bar its standing. In general, a plaintiff has standing to challenge an administrative action in federal court only if the challenged action caused it "injury-in-fact" and if the "alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." Gifford-Hill & Co., Inc. v. FTC, 523 F.2d 730, 731 (D.C.Cir.1975) (citing Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972), and Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 20 L.Ed.2d 184 (1970)). Where Congress intends standing to reach to the full limits of Article III, however, courts lack the authority to impose prudential barriers to standing. See, e.g., Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1981).
 
 
 44
 Congress has shown its intent to eliminate prudential limits under EPCA. Judicial review of agency action establishing CAFE standards may be sought by "[a]ny person who may be adversely affected by" the promulgation of those standards. 15 U.S.C. Sec. 2004(a). This court has held that by this provision, "EPCA clearly removes the judicial authority to create prudential barriers by granting review of agency action to those 'who may be adversely affected.' " CAS I, 793 F.2d at 1337 (quoting 15 U.S.C. Sec. 2004(a)); see also Public Citizen, 848 F.2d at 261.[7] As the CAS I court explained, Congress' choice of the criterion "may be adversely affected" demonstrated its intent to grant broad standing under EPCA. CAS I, 793 F.2d at 1336. Because petitioners in that case were part of a group of vehicle owners who wanted to buy fuel-efficient light trucks, but were hampered in their ability to do so by the NHTSA standards, they were "adversely affected" within the meaning of Sec. 2004(a). Id. at 1337.
 
 
 45
 Similarly, Consumer Alert's members have been "adversely affected" within the meaning of these provisions because the CAFE standards have restricted their opportunity to purchase passenger vehicles of their choice. In initiating the CAFE system, Congress was not only concerned about fuel efficiency. It was also explicitly concerned that the setting of such standards should not "unduly limit[ ] consumer choice as to capacity and performance of motor vehicles." H.R.Rep. No. 94-340, 94th Cong., 1st Sess. at 87 (1975). We therefore conclude that Consumer Alert's members have been "adversely affected" by NHTSA's decision, and that this court is without authority to place prudential barriers in their way.
 
 
 46
 Because we find that Consumer Alert has standing on behalf of its members to challenge NHTSA's decision to set the CAFE standards at 26 mpg and 26.5 mpg, respectively, for MYs 1987-88 and 1989 under EPCA, we now assess the merits of that claim.[8]
 
 II. THE MERITS OF THE EPCA CLAIM
 A. Petitioners' Claims
 
 47
 Congress prescribed the CAFE standard for passenger automobiles for MY 1985 and all subsequent model years at 27.5 mpg. 15 U.S.C. Sec. 2002(a)(1).[9] The statute authorizes the Secretary of Transportation to amend the CAFE standard, by rule, to a level which he determines is the "maximum feasible average fuel economy level" for a given model year. 15 U.S.C. Sec. 2002(a)(4).
 
 
 48
 In 1986, NHTSA initiated a rulemaking proposing to amend the average fuel economy standards applicable to passenger automobiles manufactured in MYs 1987 and 1988. See 51 Fed.Reg. 2,912. The agency proposed a range of alternative standards between 26 mpg and 27.5 mpg for each model year. In response to this notice, petitioners proposed a CAFE standard of 22 mpg, substantially below the range proposed by NHTSA. Comments of CEI on Proposed CAFE Standards for MYs 1987-88 ("CEI Comments"), J.A. at 282. See also 51 Fed.Reg. at 35,599. CEI selected 22 mpg based on an estimate that the CAFE program did not begin to affect the market until MY 1981 when the standard had been 22 mpg. 51 Fed.Reg. at 35,612. CEI claimed that a 27.5 mpg standard could entail more than 1,000 additional fatalities per year compared with a 22 mpg standard, and that NHTSA had failed to assess these safety consequences in previous rulemakings. CEI Comments, J.A. at 282-96. In issuing its final rule, NHTSA amended the CAFE standards to 26 mpg for both MYs 1987 and 1988. In so doing, NHTSA rejected CEI's contention that there would be adverse safety consequences at the 26 mpg level. 51 Fed.Reg. at 35,612.
 
 
 49
 In April 1988, CEI petitioned NHTSA to set the MYs 1989-90 CAFE standards at 24 mpg, which it described as a "non-constraining" standard in that manufacturers would meet that standard even without CAFE constraints. Petition of the CEI for a CAFE Standard of 24 mpg for Model Years 1989-90 Passenger Cars, J.A. at 460-64.[10] Consumer Alert and CEI presented evidence from a recent study of the CAFE program suggesting that a CAFE standard of 27.5 mpg would result in a 14-27 percent increase in occupant fatalities over the ten year lifespan of the model year's fleet. See Crandall and Graham, "The Effect of Fuel Economy Standards on Automobile Safety" (1988), reprinted in J.A. at 466. They argued that neither Congress nor NHTSA had made any express determination that achieving the energy conservation goals under CAFE should come at the expense of increased occupant fatalities.
 
 
 50
 NHTSA agreed with these petitioners that it should consider the adverse effects on safety of CAFE standards in more detail when those standards forced manufacturers to do "substantial additional downsizing" of the passenger car fleet; but, the agency did not agree that the evidence supported a finding that such a result would occur at a CAFE of 26.5 mpg. 53 Fed.Reg. at 39,29 4. Accordingly, it set the MY 1989 standard at 26.5 mpg. CEI and Consumer Alert filed petitions for review of both the MYs 1987-88 and MY 1989 rules.
 
 B. Discussion
 
 51
 Our review of NHTSA's action is governed by the arbitrary or capricious standard of the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 706(2)(A). Accordingly, our review is a narrow one. We must avoid substituting our judgment for that of the agency. See Motor Vehicle Manufacturers Ass'n, Inc. v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("State Farm "). It is particularly important to adhere to that standard when an agency has been called upon to weigh the costs and benefits of alternative policies. See Center for Auto Safety v. Peck, 751 F.2d 1336, 1342 (D.C.Cir.1985). In such cases, we determine whether the challenged decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." State Farm, 463 U.S. at 43, 103 S.Ct. at 2866-67 (citations omitted); see also Center for Auto Safety, 751 F.2d at 1342.
 
 
 52
 In CAS I, we determined that Congress had not directly spoken to the precise question of how much weight NHTSA should give to consumer demand. CAS I, 793 F.2d at 1338) (citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) ("Chevron ")); see also Public Citizen, 848 F.2d at 264. Similarly, Congress did not directly address safety in the CAFE legislation.[11] Therefore, we inquire whether the agency's interpretation of the statutory requirements "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." CAS I, 793 F.2d at 1338 (quoting Chevron, 467 U.S. at 845, 104 S.Ct. at 2783). In so doing, we recognize that Congress did not prescribe a precise formula by which NHTSA should determine the maximally-feasible fuel economy standard, but instead gave it broad guidelines within which to exercise its discretion. See Public Citizen, 848 F.2d at 265.
 
 
 53
 In the two rulemaking proceedings at issue, NHTSA examined the evidence of potential safety consequences of the CAFE standards presented by petitioners. It concluded that the evidence was insufficient to justify reducing the CAFE standards below the 26 and 26.5 mpg levels. Petitioners claim that NHTSA acted arbitrarily and capriciously in underestimating the significance of the effects of CAFE standards on vehicle size and safety. They claim that the size-safety relationship is so strong and direct that NHTSA should have lowered its standards to the levels manufacturers would have achieved without CAFE constraints. We disagree. The factual record before the agency on the size-safety-CAFE question is sufficiently equivocal that it was not arbitrary or capricious for NHTSA to conclude that, on balance, the CAFE standards as set would not have adverse safety consequences.
 
 
 54
 NHTSA conceded that a size-safety relationship exists. See 51 Fed.Reg. at 35,612; 53 Fed.Reg. at 39,293-94. Its review of the evidence, however, showed that relationship to be more complex than petitioners were willing to concede. 51 Fed.Reg. at 35,612. In particular, NHTSA insisted that the relationship could only be examined fairly by also recognizing that occupant fatalities overall have declined over time despite downsizing; that many small cars have achieved considerable crashworthiness; and that the potential adverse safety consequences of larger and higher performance engines might adversely affect safety even in large vehicles. Id.; 53 Fed.Reg. at 39,29 3. While petitioners do not agree with the result NHTSA reached after assessing these factors in this complex relationship, they have failed to show how reasoned consideration of such factors represents arbitrary and capricious decisionmaking.
 
 
 55
 In any event, NHTSA differed with petitioners primarily over its assessment of whether the proposed amendments to 26 mpg and 26.5 mpg would themselves lead to sufficient additional downsizing to affect vehicle safety. The petitioners assumed, for example, that GM and Ford could achieve a CAFE higher than 26 mpg only by forcing consumers to buy a higher-than-preferred percentage of small cars. While NHTSA conceded that consumer demand for larger cars had slowed Ford's and GM's CAFE progress, the agency did not agree that the modest or nonexistent weight reductions proposed by Ford and GM to meet the 26 mpg standard in MYs 1986-88 sufficiently supported petitioners' assumptions regarding forcing of consumer choices to require an even greater reduction in the CAFE standard.
 
 
 56
 Additionally, NHTSA carefully reviewed the statistical evidence concerning occupant fatalities and found that petitioners' reading of the statistics contained inaccuracies and methodological shortcomings. Indeed, one study petitioners relied on had, in fact, concluded that the relationship between the CAFE standards and occupant fatalities, as opposed to other vehicle-related facilities, was not statistically significant. 51 Fed.Reg. at 35,613. This is precisely the sort of careful review of the competing factors that NHTSA is required to conduct under its EPCA authority.
 
 
 57
 In CAS I and in Public Citizen, we concluded that NHTSA's decision to roll back the CAFE standards represented a "reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." Public Citizen, 848 F.2d at 265 (quoting Chevron, 467 U.S. at 845, 104 S.Ct. at 2783); see also CAS I, 793 F.2d at 1341. Using the same analytic approach, we again conclude that NHTSA made a reasonable accommodation of competing factors in this case, and did not act arbitrarily in deciding that CAFE standards of 26 mpg and 26.5 mpg were the "maximally feasible average fuel economy" standards for MYs 1987-88 and 1989.
 
 
 58
 NHTSA stated directly that if it were to raise the standard above 27.5 mpg, beyond the point which most manufacturers had been able to achieve without serious adverse consequences, then the issue of safety would warrant further attention because of potential size and weight reductions that might be required. 51 Fed.Reg. at 35,613. We defer to the agency's determination that the time for such an assessment has not yet come.
 
 III. ORGANIZATIONAL STANDING UNDER NEPA
 
 59
 CEI and Consumer Alert argue that if this court rejects their challenge to NHTSA's rulemaking under EPCA, then alternately, we should invalidate the rulemaking because of NHTSA's failure to assess the safety effects of the CAFE standards in an EIS. See 42 U.S.C. Sec. 4332. They assert standing to bring this secondary claim under NEPA as organizations whose activities have been impeded by NHTSA's failure to prepare an EIS. In particular, they claim the lack of an EIS has impaired their ability to disseminate information about the true costs, in safety terms, of the CAFE rules.
 
 
 60
 To maintain their NEPA challenge, petitioners must show that they have been "adversely affected" or "aggrieved" within the meaning of Sec. 10 of the APA, 5 U.S.C. Sec. 702. See Committee for Auto Responsibility v. Solomon, 603 F.2d 992, 997 (D.C.Cir.1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980). "That section confers standing only upon those to whom the challenged agency conduct has caused actual injury to an interest within the zone of interests protected by [NEPA]." Id. (citations omitted).
 
 
 61
 To show injury-in-fact, an organization must allege more than a mere "setback to [its] abstract social interests." Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). Rather, it must allege "that discrete programmatic concerns are being directly and adversely affected" by the challenged actions. American Legal Foundation v. Federal Communications Comm'n, 808 F.2d 84, 92 (D.C.Cir.1987); cf. Sierra Club v. Morton, 405 U.S. 727, 738, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972) (organization's interest in seeing the nation's natural resources protected from degradation insufficient basis for standing); CAS I, 793 F.2d at 1328 n. 41 (damage to institution's interest in fuel conservation not cognizable injury).
 
 
 62
 Allegations of injury to an organization's ability to disseminate information may be deemed sufficiently particular for standing purposes where that information is essential to the injured organization's activities, and where the lack of the information will render those activities infeasible. In Action Alliance of Senior Citizens v. Heckler, 789 F.2d 931, 936-39 (D.C.Cir.1986), for example, we found that an organization's ability to counsel members on unlawful age discrimination in benefit denial was diminished by regulations limiting the flow of information about age discrimination. See also Havens Realty Corp. v. Coleman, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982) (racial steering practice denied organization information necessary for its counseling and referral services). To establish standing on this basis, however, petitioners must assert a plausible link between the agency's action, the informational injury, and the organization's activities. See Community Nutrition Inst., 698 F.2d at 1254 (although deprivation of information constituted adequate injury-in-fact, standing was lacking when plaintiff "failed to establish any connection between the alleged injury and the challenged regulation") (emphasis in original); cf. Action Alliance, 789 F.2d at 937 (challenged regulation directly restricted information previously provided by the government).
 
 
 63
 These cases demonstrate that, to sustain informational standing, organizations must point to concrete ways in which their programmatic activities have been harmed. Here, petitioners have merely alleged an interest in having NHTSA discuss the "true cost" of the CAFE standards in safety terms. They have failed to show how the lack of that assessment from NHTSA has significantly harmed their ability to educate and inform the public about highway safety. Therefore, under standing principles generally governing assertions of informational harm to organizations, petitioners' allegations fail to posit a cognizable injury.
 
 
 64
 Because petitioners' claim arises under NEPA, however, the question of standing may require further consideration. This court has suggested on occasion that NEPA's purpose of ensuring well-informed government decisions and stimulating public comment on agency actions effectively lowers the threshold for establishing injury to informational interests. This approach appears to be based on the premise that NEPA creates a right to information on the environmental effects of government actions; any infringement of that right constitutes a constitutionally cognizable injury, without further inquiry into causation or redressability. In Scientists' Institute for Public Information, Inc. v. Atomic Energy Comm'n ("AEC"), 481 F.2d 1079 (D.C.Cir.1973) ("SIPI "), we stated, albeit in dicta, that injury to an organization's interest in distributing information and stimulating debate on scientific issues allegedly resulting from the AEC's refusal to assess the environmental effects of its liquid metal breeder reactor program sufficed for NEPA standing purposes. See 481 F.2d at 1087 n. 29. This dicta in SIPI has subsequently been cited to support recognition of similar informational injuries arising from an agency's failure to prepare an EIS. See, e.g., National Wildlife Federation, 839 F.2d at 712 (involving individual plaintiffs, not organizations).
 
 
 65
 Nevertheless, a right to specific information under NEPA has so far been recognized for standing purposes only when the information sought relates to environmental interests that NEPA was intended to protect. See National Wildlife Federation, 839 F.2d at 712 (holding that "for affiants voicing environmental concerns ..., the elimination of an opportunity to see and use an EIS ... does constitute a constitutionally sufficient injury") (citing SIPI ); Sierra Club v. Andrus, 581 F.2d 895, 900 n. 16 (D.C.Cir.1978), rev'd on other grounds, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979) ("[W]e have held that an organization with an institutional concern with informing both its members and the public on matters of public policy and decisions which fall within the concern of NEPA has a statutory right to the information which NEPA obliges the agency to compile in an EIS.") (citing SIPI ). We find that there is a critical difference between seeking an EIS for the purpose of disseminating information about potential environmental harm and seeking an EIS as a vehicle for obtaining or disseminating information on a nonenvironmental issue. In this case, petitioners seek consideration of safety in an EIS in order to disseminate to the public information on traffic fatalities. This interest falls outside the sphere of any definition of injury adopted in NEPA cases. In short, petitioners' alleged injury meets neither traditional standing tests nor even the more liberal test some of our cases have applied to NEPA claims.
 
 
 66
 Even if petitioners' allegations did suffice to show cognizable injury to their programmatic activities, petitioners would still fail to surmount prudential barriers to their assertions of standing because they are not "arguably within the zone of interests to be protected or regulated" by NEPA. Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970). NEPA's concern is to inform other governmental agencies and the public about the environmental consequences of its proposed activities, not to inform them about all possible consequences of an agency's action. See, e.g., Gifford-Hill & Co., Inc. v. Federal Trade Comm'n, 523 F.2d 730, 732 (D.C.Cir.1975) ("NEPA's concern is with protection of the environment, not with the desire of parties to prevent or delay administrative efforts to enforce the antitrust laws."). In this case, petitioners' real concern is with receiving and disseminating adequate information about highway safety as it may be affected by fuel economy standards, not with receiving and disseminating information on the environmental consequences of those standards. Petitioners' claim thus runs the risk of frustrating rather than furthering statutory objectives; petitioners therefore fall outside NEPA's zone of interests. See Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 397 n. 12, 107 S.Ct. 750, 756 n. 12, 93 L.Ed.2d 757 (1987).
 
 
 67
 In conclusion, we reiterate that neither petitioner has alleged an "environmental harm" that could result from NHTSA's decision not to address highway safety concerns in an EIS. Therefore, Consumer Alert and CEI lack organizational standing under NEPA.
 
 IV. CONCLUSION
 
 68
 We find that petitioner Consumer Alert has standing on behalf of its members to challenge NHTSA's assessment of safety in its EPCA rulemaking proceedings. On balance, however, we conclude that NHTSA's decision to reduce the CAFE standards to 26 mpg and 26.5 mpg for MYs 1987-88 and 1989 was not arbitrary and capricious, and must be affirmed. We decline to recognize organizational standing on the part of either petitioner as neither has alleged informational injury that is directly concerned with environmental issues. Accordingly, petitioners' EPCA petition is denied and their NEPA petition is dismissed.
 
 
 69
 It is so ordered.
 
 D.H. GINSBURG, Circuit Judge, concurring:
 
 70
 I agree that Consumer Alert has established its standing to challenge NHTSA's decision not to reduce the CAFE standards for MYs 1987-88 and 1989 below 26.0 and 26.5 mpg respectively. First, as to the injury-in-fact constitutionally required for standing: it appears that NHTSA's decision caused at least some automobile manufacturers to add a surcharge during those model years, as they had in prior model years, to the retail prices of their larger and less fuel-efficient cars, in order to decrease the number of such units sold and thus to increase their achieved CAFE. Thus, if the 1987-88 and 1989 CAFE standards had been set lower, the manufacturers would have lowered or removed the regulation-induced surcharge, thus lowering the prices paid by consumers for larger cars.
 
 
 71
 Second, as to prudential standing under EPCA: because Consumer Alert's members want to buy larger cars that afford greater safety protection to their occupants, and Congress intended, when it enacted EPCA, to preserve such choices for consumers, petitioner comes within the zone of interests protected by that statute. If that is a requirement for standing under EPCA--as I believe it is notwithstanding contrary circuit law, which has been thrown into doubt by an intervening Supreme Court decision--then petitioner is qualified on that ground as well to pursue its claim.
 
 
 72
 * Despite the indirection with which both NHTSA and the automobile manufacturers seem to approach the point, it is clear from the records compiled in these rulemaking proceedings that General Motors and Ford were adding a premium to the price of their larger cars prior to MY 1987. In its Notice of Proposed Rulemaking for MYs 1987-88, NHTSA reported that "Both GM and Ford have undertaken pricing actions to discourage large car sales and the purchase of optional, less fuel-efficient engines." 51 Fed.Reg. 2912, 2918 (Jan. 22, 1986). So far as that statement reveals, of course, the manufacturers might merely have discounted the prices of their smaller cars, thus effectively increasing the marginal price that consumers would have to pay for incremental automotive size. It is reasonably clear, however, that the manufacturers were doing more than just discounting small cars; in the sentence immediately following the one just quoted, the agency telegraphs that the previously-mentioned "pricing actions to discourage large car sales" included the imposition of a regulation-induced price premium: "Below-market financing offerings, cash discounts, and non-cash consumer and dealer incentives were some of the other measures undertaken by Ford and GM to increase their CAFE through marketing actions." By referring to these various means of discounting the prices of small cars as "other measures," NHTSA makes irresistible the inference that the "pricing actions" to which it adverted in the preceding sentence were indeed surcharges. When NHTSA promulgated its Final Rule for 1987 and 1988, it was more explicit, stating that "GM and Ford have already raised the prices of their larger cars and engines as part of their efforts to improve CAFE...." 51 Fed.Reg. 35,594, 35,604 (Oct. 6, 1986).
 
 
 73
 NHTSA clearly understands that Congress instructed it to administer the CAFE program so as not to induce "product restrictions." It is apparent that the agency does not interpret a manufacturer's reducing the price of its small cars in order to achieve compliance with a CAFE standard as a form of product restriction, and that is reasonable enough. It also seems, however, that the agency does not regard a surcharge on larger cars, imposed solely in order to discourage their sale, as a product restriction, at least until the surcharge rises to some (unspecified) level of significance. Thus, when the agency acknowledged that "GM and Ford have already raised the prices of their larger cars and engines as part of their effort to improve CAFE," it did not see such increases as amounting to product restrictions. Contemplating the price effect that a still-higher CAFE standard would have, NHTSA went on to observe: "While very large price increases would likely reduce sales of less fuel-efficient vehicles significantly, such increases would amount to product restrictions." 51 Fed.Reg. 35,594, 35,604 (Oct. 6, 1986).
 
 
 74
 We need not decide today whether the agency oversteps its authority under EPCA when it imposes a CAFE standard that manufacturers can meet only by imposing a surcharge upon their larger cars. Since the demand for a product is decreased as its price is increased--which is the whole point of the manufacturers' using a surcharge to discourage sales--it would seem that any regulation-induced price premium amounts to something of a "product restriction" in terms both of economics and of ordinary language. Since manufacturers may have some discretion, however, in deciding whether to meet a given CAFE standard merely by relying entirely upon discounting the prices of small cars, or by relying in addition or instead upon increasing the prices of large cars, it may be consistent with Congressional intent for the agency to disregard the product-restricting effect of price increases below some level of significance. Again, that precise issue is not before us today.
 
 
 75
 The standing issue that is before us, however, is more readily resolved in light of the agency's acknowledgement that the two largest American automobile manufacturers have "raised the prices of their larger cars and engines" in an effort to achieve compliance with the CAFE standard in effect for 1986, which was continued through 1987 and 1988 and increased for 1989. In a competitive market such as that for automobiles, we may confidently presume that those manufacturers could not continue to impose the CAFE-induced surcharge after the CAFE standards that occasioned it were relaxed by the agency. The CAFE program imposes a marginal cost on the manufacturer whose average fuel economy falls short of the mandated minimum. Lowering that minimum lowers a manufacturer's CAFE costs and, through the transmission belt of competition, the price to consumers. Failure to reduce the CAFE standard, as Consumer Alert requested, prevented that price reduction, and thus imposed an economic penalty--as palpable an injury-in-fact as any--upon petitioner's members.
 
 
 76
 Thus, there is no need for the court to rely upon, as it does, the extensive evidence designed to show that raising the CAFE standard above 26.0, and specifically to 27.5, would have induced further product restrictions. Evidence concerning the effects of a CAFE standard above 26.0 cannot establish a linear relationship between CAFE and "product restrictions" at points below 26.0. That is irrelevant, however, when one sees that the manufacturers had been impelled to add a surcharge when the CAFE standard was 26.0 and that competition would have required them to reduce or eliminate that surcharge had NHTSA reduced the CAFE standard below that point.
 
 
 77
 For the same reason, the injury to petitioners here is not the sort of speculative claim that was presented to the en banc court in CAS II. There, various consumer representatives challenged an agency rule that credited automobile manufacturers retroactively for changes in the way that fuel economy is measured. The injury component of the challengers' standing depended upon the prediction that, as a result of the CAFE credits that the manufacturers would receive, they would "produce a smaller variety of fuel-efficient cars." 847 F.2d at 868. (Buckley, J.). Here, we are not asked to predict, nor to accept any prediction about, the change in the product line that the manufacturers will offer. No technological or lead time barriers need be assessed. See id. at 872-73 (Buckley, J.).
 
 
 78
 Whatever the difficulties associated with predicting the nature and incidence of the burden that results when a regulation is made more constraining, it is relatively easy to see--at least in a competitive market--how some consumers will benefit if a regulatory constraint is relaxed, and therefore how they continue to be burdened when the regulatory agency denies their request that it be relaxed.
 
 II
 
 79
 Having no doubt that Consumer Alert satisfies the constitutional requirements for standing to challenge NHTSA's decisions setting CAFE standards under EPCA, I pause to consider its prudential standing. While this court held in CAS I that Congress intended to eliminate all prudential requirements for standing to sue under EPCA, it seems to me that our position must be revisited in light of the Supreme Court's subsequent decision in Clarke v. Securities Industry Association, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). See Hazardous Waste Treatment Council v. Thomas, 885 F.2d 918, 921 (D.C.Cir.1989).
 
 
 80
 In Clarke, the Supreme Court reiterated that the prudential limitations on standing do apply to judicial review under Sec. 702 of the Administrative Procedure Act. That statute contemplates review at the instance of any person "suffering legal wrong because of agency action or adversely affected or aggrieved by agency action." 5 U.S.C. Sec. 702. In light of the facial similarity between that language and the provision of EPCA authorizing review at the behest of "[a]ny person who may be adversely affected" by an agency action under EPCA, the court's conclusion in CAS I that Congress intended to eliminate all prudential barriers to standing under EPCA no longer seems tenable. (Indeed, on close inspection, the standing authorized in EPCA seems, if anything, narrower than that contemplated by the APA.) Consumer Alert must therefore show that its members' interest in safety falls "arguably within the zone of interests to be protected or regulated" by EPCA. Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972), quoting Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). This it has done.
 
 
 81
 Consumer Alert alleges that NHTSA's decision impairs its members' ability to purchase the larger--and therefore less fuel-efficient but safer--cars that they prefer. Preventing consumers from exercising such choice--i.e., regulating their purchases--was clearly the intent of the Congress that enacted EPCA, and that intent is reflected in the surcharges Consumer Alert's members must pay. Because consumers' choices are thus regulated by the rules propounded under EPCA, they have prudential standing to challenge NHTSA's implementation of the statute to ensure that it faithfully complies with Congress's intent to further the goal of fuel efficiency without "unduly limiting consumer choice as to capacity and performance of motor vehicles." H.R.REP. No. 94-340, 94th Cong., 1st Sess. at 87 (1975).
 
 III
 
 82
 For these reasons I join the court in concluding that Consumer Alert has standing, on behalf of its members, to challenge NHTSA's rulemaking. I join in the opinion of the court except to the extent that our reasoning to this preliminary point diverges.
 
 
 
 [1]
 CEI is a nonprofit organization devoted primarily to advancing free-market solutions to economic issues and to fostering public awareness of the hidden costs of government regulatory programs
 
 
 [2]
 Consumer Alert is a nonprofit membership organization engaged in the study and dissemination of information on consumer issues, especially with respect to the restriction of consumer choice by government regulation
 
 
 [3]
 Two sets of petitioners originally challenged NHTSA's amendment of the MYs 1987-88 CAFE standards: (1) Competitive Enterprise Institute, et al. (No. 86-1646) (challenging the amended CAFE standards on safety grounds); and (2) City of Los Angeles and City of New York, et al. (Nos. 86-1649, 86-1651, and 86-1652) (challenging the amended CAFE standards on environmental grounds). Two sets of petitioners also challenged NHTSA's amendment of the MY 1989 CAFE standard: (1) CEI and Consumer Alert (No. 89-1278) (challenging the amended CAFE standard on safety grounds); and (2) Natural Resources Defense Council, et al. (Nos. 89-1277 and 89-1403) (challenging the amended CAFE standard on environmental grounds). After considering the issues and arguments presented by the parties, this court has reorganized the cases for purposes of issuing its opinions. The opinion presented here addresses Competitive Enterprise Institute's and Consumer Alert's challenge to the MYs 1987, 1988, and 1989 amended CAFE standards on safety grounds. A forthcoming companion opinion will address the challenge to the amended CAFE standards in City of Los Angeles and City of New York, et al. v. National Highway Traffic Safety Administration (Nos. 86-1649, 86-1651, 86-1652, 89-1277 and 89-1403) based on environmental grounds
 
 
 [4]
 The MYs 1987-88 Final Rule appears at 51 Fed.Reg. 35,594 (Oct. 6, 1986), codified at 49 C.F.R. Sec. 531.5 (1987), and the MY 1989 Final Rule appears at 53 Fed.Reg. 39,275 (Oct. 6, 1988) (to be codified at 49 C.F.R. Sec. 531.5)
 
 
 [5]
 In Public Citizen v. NHTSA, 848 F.2d 256 (D.C.Cir.1988), consumer groups challenged NHTSA's decision to reduce the CAFE standards for passenger vehicles. This court determined that petitioners' allegations in Public Citizen were not rationally distinguishable from those in CAS I, and in accordance with CAS I, found that the consumer groups had standing under EPCA. 848 F.2d at 259. In Center for Auto Safety v. Thomas, 847 F.2d 843 (D.C.Cir.), vacated, 856 F.2d 1557 (D.C.Cir.1988) ("CAS II "), this court en banc attempted unsuccessfully to decide whether petitioner-consumer groups had standing to challenge an Environmental Protection Agency ("EPA") rule that compensated automobile manufacturers retroactively for changes in EPA's fuel-efficiency testing procedures. An evenly divided en banc court left the original EPA rule in effect, and made clear that none of the separate opinions issued in that case should "be considered as establishing precedent as to any aspect of standing." Id
 
 
 [6]
 Eight of the ten members of the otherwise divided en banc CAS II court agreed with the CAS I court's conclusion that petitioners had suffered injury from their restricted opportunity to purchase fuel-efficient vehicles. See CAS II, 847 F.2d at 867 (opinion of Buckley, J.) ("After carefully reconsidering CAS I, we agree with the panel's holding that CAS, Public Citizen, and UCS have alleged a constitutionally cognizable type of injury."); but see Buckley op. at 867-68 (four of the eight judges who found constitutionally cognizable injury did not find it necessary to decide whether injury was sufficiently real and immediate, and not merely conjectural or hypothetical)
 
 
 [7]
 Our colleague in concurrence expresses skepticism as to whether CAS I 's holding that prudential limitations do not apply under EPCA is still good law in view of Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). We are not convinced that Clarke is determinative on that issue; the APA language there construed referred to the standing of a person "adversely affected or aggrieved" by agency action, while EPCA speaks of one who "may be adversely affected." Beyond that difference, however, Clarke is "most usefully understood as a gloss on the meaning of Sec. 702 [of the APA.]" Clarke, 479 U.S. at 400 n. 16, 107 S.Ct. at 758 n. 16. Indeed, Clarke itself warned against any "universal application" of the APA zone of interest test, advising that each statute must be interpreted on its own. Id. If the zone of interest test were applicable in this case, however, we would agree with our colleague that it is met here
 
 
 [8]
 Both Consumer Alert and CEI claim that they were also injured in their organizational capacity by NHTSA's failure to address the adverse safety consequences of CAFE either in its statement of basis and purpose in support of its Final Rules under EPCA or in an EIS under NEPA, 42 U.S.C. Sec. 4332(2)(C). Because we find that Consumer Alert has standing to bring the EPCA claim on behalf of its members, we need not decide whether CEI and Consumer Alert also have standing to pursue the identical EPCA claim as organizations. See, e.g., Natural Resources Defense Council v. Securities and Exchange Comm'n, 606 F.2d 1031, 1042 n. 6 (D.C.Cir.1979) (because organization claiming institutional interest in informing and educating the public took same position as membership organizations which had representative standing, court found it unnecessary to determine whether it would have had standing alone to bring the claim). We will discuss in Part III of this opinion CEI's and Consumer Alert's standing as organizations to challenge NHTSA's decision not to prepare an EIS under NEPA
 
 
 [9]
 The statutory framework for the rulemaking that resulted in the amendments to the CAFE standards challenged by petitioners is described in detail in CAS I, 793 F.2d at 1324-26. See also Public Citizen, 848 F.2d at 260
 
 
 [10]
 NHTSA received four other petitions to lower the passenger car CAFE standards for MYs 1989 and 1990. All four of those petitions based their request for a lower standard on the reported inability of automobile manufacturers to meet the statutorily set standard of 27.5 mpg. NHTSA ultimately agreed with those other four petitioners and set the standard for MY 1989 at 26.5 mpg. See 53 Fed.Reg. 39,275 (1988). In May 1989, NHTSA terminated its rulemaking procedure for MY 1990, concluding that it would end its practice of lowering the CAFE standards because of the nation's increasing need to conserve energy and because the 27.5 mpg standard would not have a significant adverse effect on U.S. industry. 54 Fed.Reg. 21,985
 
 
 [11]
 Petitioners have never clearly identified the precise statutory basis on which safety concerns should be factored into the CAFE scheme, although they alluded to occupant safety as part of the "economic practicability" criterion in their MY 1989 petition to NHTSA and at oral argument. We do not find this failure fatal, however, because NHTSA has always examined the safety consequences of the CAFE standards in its overall consideration of relevant factors since its earliest rulemaking under the CAFE program, see Final Rule, MYs 1981-84, 42 Fed.Reg. at 33,534, 33,551 (June 30, 1977); see also Final Rule, MY 1986, 50 Fed.Reg. at 40,547-48 (Oct. 4, 1985). Moreover, NHTSA itself believes that Congress was cognizant of safety issues when it enacted the CAFE program. As evidence, NHTSA discusses a congressional report that dealt with the safety consequences of a downsized fleet of cars which had been considered by Congress during its enactment of the CAFE program. 53 Fed.Reg. at 39,29 4 (citing Department of Transportation and the EPA, "Potential for Motor Vehicle Fuel Economy Improvements: Report to the Congress," Oct. 24, 1974) ("[A] sustained or increased shift to small cars, without a concurrent upgrading of their occupant protection capability, would likely lead to an increase in the rate of highway deaths and serious injuries.")